# United States of America *against* William Nicholls.

The 5th section of the act of congress of 3d March 1797, directing that "debts "due to the United States, shall be first satisfied," does not extend to cases where a particular state has a lien.

MOTION by Mr. M'Kean, attorney general, to take 14,503 dollars, arising from the sale of the defendant's lands by the sheriff, out of court.

This motion was opposed by Mr. Dallas, who filed a claim in behalf of the United States, to the money, as attorney of the United States for the district of Pennsylvania, under the execution, and divers acts of congress, and particularly of the act of 3d March 1797.

The facts were admitted to be as follow:

The defendant, Nicholls, being indebted to the United States of America, on the 9th June 1798, executed a mortgage to Henry Miller, supervisor of the revenue for the district of Pennsylvania for the use of the United States, in the sum of 59,444 dollars, conditioned for the payment of 29,271 dollars, whereof 9,757 dollars were payable on the 1st January 1799, other 9,757 dol·

lars on the 9th June 1799, and the remaining 9,757 dollars on the 9th September 1799.

A *scire facias* was issued upon the said mortgage, returnable *252] *to September term 1800, in this court and judgment was entered up thereon, on the 6th March 1802. A *levari facias* issued thereupon and was levied upon the lands of the said William Nicholls ; and the same being sold by the sheriff to the highest and best bidder for the sum of 14,530 dollars, the money was brought into court, and is now deposited in the hands of the prothonotary of this court, subject to the order of this court.

Previously hereto, on the 31st December 1797, the accounts of the said William Nicholls, with the commonwealth of Pennsylvania, were settled by the comptroller and register general of this commonweath.

An appeal from the said settlement was filed in the office of the prothonotary of the Supreme Court, on the 6th March 1798, and judgment was afterwards entered in this court on the 6th September 1802, in favor of the commonwealth, against the said William, in the sum of $9,987.15.

On the 12th May 1802, the said William Nicholls, executed an assignment of all his estate real and personal, to John Baker, William Turnbull and Tench Coxe, in trust for his creditors ; and on the 28th of the same month, a commission of bankrupt issued against him, upon which he obtained afterwards a certificate of conformity.

The motion was argued at the last term by Mr. M'Kean, for the commonwealth, and by Mr. Dallas, for the United States.

The arguments for the commonwealth, were substantially as follow :

It has been decided in this court between Smith and Nicholson on full argument, that the general lien created by the comptroller's settlement of an account, by the act of 18th February 1785, (2 St. Laws, 251,) is not repealed either by the express words of, or any necessary implication arising from, any subsequent law passed on the subject. On the true exposition of this act, the state founds her claim to the prior lien on the real property which has been sold. It is not grounded on the judgment of a court of record upon the appeal, but on the settlement made by the department of accounts, which was confirmed on the appeal. Hence it is, that the act of 4th April 1798, (4 St. Laws, 300,) which provides that judgments shall have no effect beyond five years, unless there has been a *scire facias* thereon is wholly inoperative here. No *scire facias* could issue from the office of the comptroller general, to revive the settlement.

I make two positions. 1. That the United States cannot constitutionally take priority of an individual state in payment of debts ; but that in all events, they cannot enact a law, defeating the pre-existing rights of liens of any of the states.

[United States v. Nicholls.]

*2. If such right or lien of a state can be thus defeated consti-tutionally, the act of congress of 3d March 1797, (3 U. S. Laws, 421,) is not applicable to the case before the court.

I. The primary enquiry will be, from whence do congress gain this right of priority?

Under the old confederation agreed to in congress November 15, 1777, 3 Journ. Cong. 502, but not ratified by Maryland, till March 1, 1781, no state was to lay any imposts or duties, which might interfere with any stipulations in treaties entered into by congress, (art. 6,) but the taxes for paying the proportion of the several states, for the common defence or general welfare, were to be laid and levied by the authority and direction of the legis-latures of the several states, (art. 8.)

The legislature therefore had an unquestionable right to enact the law of 18th February 1785, for the better security of her own revenue. Has she since surrendered up her right, either by the adoption of the constitution of the United States, by the formation of her new frame of government, or by the bill of rights reserved to the people?

It will not be pretended, that this has been done by either of the two last instruments. The restrictions on the powers of the several states are contained in the 10th section of the 1st ar-ticle of the constitution of 1787. The powers granted to con-gress are to be found in the 8th section of the same article.

The states in all unenumerated cases, are left in the enjoy-ment of their sovereign and independent jurisdictions. 1 Fed-eralist, No. 32, 33. This construction has since been fully confirmed by the 12th article of amendments, which declaies "that the powers not delegated to the United States by the consti-"tution, nor prohibited by it to the states, are reserved to the "states respectively, or to the people." This article was added "to prevent misconstruction or abuse" of the powers granted by the constitution, rather than supposed necessary to explain and secure the rights of the states, or the people.

It cannot be said that congress have acquired a right to secure to the United States priority of payment over individual states by the express words of the constitution; but it will be con-tended, that by the concluding clause, congress have power "to "make all laws, which shall be necessary and proper for carry-"ing into execution the foregoing powers, and all other powers "vested by the constitution in the government of the United "States, or in any department or offices thereof."

The plain import of this clause is, that congress shall have all the incidental or instrumental powers, necessary and proper for carrying into execution all the express powers; whether they be vested in the government of the United States, more collectively, *or in the several departments, or officers thereof. It [*254 neither enlarges any power specifically granted, nor is it a grant of new powers to congress; but merely a declaration, for the removal of all uncertainty, that the means of carrying

into execution those otherwise granted are included in the grant. Wherever a question arises on the constitutionality of a particular power, if it be not expressed, the only inquiry must be, whether it is properly an incident to an express power, and necessary to its execution. If it be, it may be exercised by congress ; if it be not, congress cannot exercise it. 1 Tuck. Bla. Append. 287, 288.

The question is then asked, to what express power is this claim of priority in payment an incident, and necessary to its execution. Is it necessary and proper, in order to lay taxes, to declare war, to raise and support armies, to provide and maintain a navy, &c. &c., that the vested rights and interests of individual states should be sacrificed to the general union ? Admit the principle asserted by the attorney for the district, and there can be no security to any state. She could trust no man or set of men in monied concerns, lest they might become debtors to the United States.

The funds of the state might be diverted from their proper channels, to make up the deficits in the revenues of the union. A state cannot be sued, and yet without the formality of a suit, she might be deprived of her just rights in this mode.

But the constitution of the United States must be construed strictly when the antecedent rights of a state may be drawn in question. 1 Tuck. Bla. Append. 257. Individual states possess an independent and uncontrolable authority to raise their own revenues for the supply of their own wants. 1 Federalist, No. 32, pa. 201.

II. The liens of the United States and of each distinct state should be paid and satisfied in their natural order, as they attached respectively.

Thus if congress and this state should lay a direct tax upon lands, and provide that the property should be bound by the assessment, the first assessment must be first discharged.

In this case, the settlement of the defendant's account by the comptroller and register general, preceded the mortgage to the supervisor, five months and nine days. The mortgage merged and extinguished the original debt of the defendant, and the taking of it shewed this to be the sense of the revenue officers. It might be said with equal propriety, that the original debt bound the lands of Nicholls, which had not been described in the mortgage, as to assert that the original debt still continued a lien after a sealed instrument had been given in lieu thereof.

The 5th section of the act of congress of 3d March 1797, is *much relied on. But it respects debtors of the United *255] States becoming insolvent, or the estate of a deceased debtor in the hands of executors or administrators, insufficient to pay all the debts. Here the money is in the hands of the sheriff, who has paid it into court, and not in the hands of assignees, of executors or administrators. The act contemplates revenue officers, &c. indebted generally, and does not regard

those cases, where their property is under pievious incumbrances. It is not provided, that a judgment creditor shall lose his lien, nor was any such thing intended. By such extension of the general expressions, mortgages and executions executed would be defeated, in favor of the union ; they are all securities for the payment of debts. The priority of payment secured to the United States on every reasonable ground of construction, relates solely to property belonging exclusively to such insolvent, or to the personal representatives of the deceased debtor, over which they had dominion and controul.

Should however this construction not obtain in the case of individual creditors, it is insisted, that the act is not applicable in the case of distinct states being creditors. The most clear and explicit words are necessary for such a purpose.

The sense of the union on this subject is fully shewn in the bankrupt act of the 4th April 1800. 5 U. S. Laws 45. The 62d section expressly saves the right of the United States, and of each state to their debts ; and the 63d section saves all existing liens at the time of passing the law.

In the case of the United States *v*. Fisher and others, lately determined at Washington, there was no existing lien ; nor was the question as to a particular state retaining its lien against the United States, judicially before the court. Here it is evident that the commonwealth founds her claim to the money, on a lien legally and constitutionally created by the settlement of the comptroller and register general on the 31st December 1797. But the United States only claim from the assignment made on the 12th May 1802, or from the date of their mortgage.

Arguments in opposition to the motion.

The authority and legal right of this court to declare a law of this state, or of the United States, to be unconstitutional, is not doubted. But it must be on the clearest and plainest grounds, not on the ground of expedience.

The 6th article of the constitution of the United States, has declared, that "the constitution and the laws of the United "States, which shall be made in pursuance thereof, shall be the "supreme law of the land ; and the judges in every state shall "be bound thereby, any thing in the constitution or laws of any "state to *the contrary notwithstanding." If the act of 3d March 1797, is made in pursuance of the constitution, [*256 it must prevail, according to its true meaning.

Almost every state in the union has secured a preference to themselves, in the payment of debts. Under an old law of Pennsylvania, the king and proprietaries were to be first paid.

The same preference continued here to the commonwealth, since the revolution, until the passing of the act of 19th April 1794, 3 St. Laws, 521, by the 14th section whereof, it is altered. Why then is congress found fault with, for doing what almost every state has done ? Where flowed the power of passing the

4 YEATES—16

[United States *v.* Nicholls.]

act in question, unless it be considered as an incident of government ?  It is a measure of policy, that congress should possess this power.  They declare war, raise and support armies, provide and maintain a navy, and protect the union, in its internal and external relations.  Money cannot be drawn from the public treasury, without an express appropriation.  The debts of the union must be paid by the government with good faith.

In the case cited, between the United States and Fisher and others, assignees of Peter Bright, the chief justice in delivering the opinion of the majority of the Supreme Court, justly observed, " that in construing the clause of the constitution, au-" thorizing congress to make all laws, which shall be necessary "and proper for carrying into execution the powers vested by " the constitution in the government of the United States, or in "any department or offices thereof,"—"it would be incorrect, "and would produce endless difficulties, if the opinion should "be maintained, that no law was authorized, which was not in-"dispensably necessary to give effect to a specified power. "Where various systems might he adopted for that purpose, "it might be said with respect to each, that it was not neces-" sary, because the end might be obtained by other means. " Congress must possess the choice of means, and must be em-"powered to use any means, which are in fact conducive to "the exercise of a power, granted by the constitution."

" The government is to pay the debts of the union, and must "be authorized to use the means which appear to itself most " eligible to effect that object."

" This claim of priority on the part of the United States, will, "it is said, interfere with the right of the state sovereignties "respecting the dignity of debts, and will defeat the measures " which they have a right to adopt to secure themselves against " delinquencies, on the part of their own revenue officers.   But " this is an objection to the constitution itself.   The mischief " suggested, so far as it really can happen, is the necessary con-" sequence of the supremacy of the laws of the United States, " *on all subjects, to which the legislative power of congress extends."

*257]

It is true, there was no existing lien in that case ; nor was the question as to a particular state retaining its lien against the United States, then immediately before the court for decision.   But the reasoning of the majority of the court necessarily sprung out of the subject before them, and it is presumed, is unanswerable.

The act of congress of 3d March 1797, relates generally to the collection of the debts of the United States, without viewing the other engagements of the debtors.   The 5th section refers to insolvencies, and the estates of deceased persons, and declares that " debts due to the United States, shall be first satisfied, and that " the priority thereby established, shall be deemed to extend, as " well to cases in which a debtor, not having sufficient property " to pay all his debts, shall make a voluntary assignment there-

[United States *v.* Nicholls.]

" of, or in which the estate and effects of an absconding, con-
" cealed or absent debtor, shall be attached by process of law,
" as to cases in which an act of legal bankruptcy shall be com-
" mitted."

Here has been an assignment under all these circumstances,
and a complete act of bankruptcy, which vests the priority of
payment in the union.    This priority attaches on the property,
as it is found at the time of insolvency.    If the debtor has mort-
gaged his lands, the legal estate is no longer in him, but he re-
tains the equity of redemption.    If he has pledged his goods,
they are bound thereby to the pawnee.    But judgments unex-
ecuted, come in equally with other debts, under the provisions
of the bankrupt law.                                                      .

No retrospective construction of the act of 3d March 1797,
is insisted on.    On the passing of that law, the United States
obtained a constitutional preference of payment.    The supervisor
of the district having accepted a mortgage from the debtor, does
not extinguish this right of preference, but it remained *in statu
quo.*

The commonwealth made no claim under their old running
account, until after this mortgage was taken.    But the claim of
the United States was on record, a matter of public notoriety.

The state law of 18th February 1785, created a lien in favour
of the state upon settlement of the account by the proper de-
partment ; but it was suspended by the appeal, until judgment
was entered thereupon on the 6th September 1802, in this court.

If this judgment had been in favor of an individual, and an
act of bankruptcy had been afterwards committed by the debtor,
no difficulty could have occurred, as to the preference claimed
by the United States ; and it is apprehended, that the claim
made by the commonwealth can form no essential difference.

The question is of great magnitude.    Should the opinion of
*the court be in favour of the commonwealth, it is re-      [*258
quired that the record should be in such a form, as that it
may be removed to the High Court of Errors and Appeals, that
a writ of error may, if necessary, be issued thereupon by the
Supreme Court of the United States, under the 25th section of
the act of congress, passed 24th September 1789.    1 U. S.
Laws 63.

The matter was continued under advisement ; and this term
the opinions of the court were delivered *seriatim.**

YEATES, J.    I cannot bring myself to believe, notwithstand-
ing the generality of words used in the 5th section of the act of
congress of 3d March 1797, " the debts due to the United States,
" shall be first satisfied," that the provision therein contained
was ever intended to extend to cases where an individual state
was a creditor, and as such was clearly entitled under its muni-
cipal laws to a lien on the estate real or personal, of the insolvent

* *Absente,* Chief Justice.

[United States *v.* Nicholls.]

debtor.  No section or clause in any part of the act respects in the most distant manner the several states in their political and corporate capacities, as competitors with the United States ; but on the contrary, every regulation and provision in the act is confined to the settlement of accounts, between the United States and individual citizens.

It has been truly said, that the constitution of the United States, considered as federal, is to be construed strictly in all cases, when the antecedent rights of a state may be drawn in question, Tuck. Bla. Append. 151 ; and it is a maxim of political law, that sovereign states cannot be deprived of any of their rights by implication, nor in any manner whatever, but by their own voluntary consent, or by submission to a conqueror.  Ib. 143. It would certainly require strong, clear, marked expressions, to satisfy a reasonable mind, that the constituted authorities of the union contemplated by any public law, the devesting of any pre-existing right or interest in a state ; or that the representatives of any state would have agreed thereto, even supposing the legitimate powers of congress in such particular, to be perfectly ascertained and settled.

The members of this court were unanimously of opinion, in Smith v. Nicholson, December term 1803, that the provision of the general lien, created by the act of assembly of 18th February 1785, on the settlement of an account by the comptroller general, continued in full force, and was not repealed either by the express words of any subsequent law, or by necessary implication.  When the powers of the Supreme Executive Council became vested in the governor, the necessity of the governor's de- 259*] *cision in the settlement was wholly superseded, unless the comptroller general should disapprove of the settlement made by the register general.

The legislature of this commonwealth had the unquestionable right to make such a law in 1785, to secure the fiscal interest of the state.   This power was not delegated to the United States amongst the other enumerated powers, nor prohibited to the state by the constitution of 1787.   But congress was authorised by act 1. s. 8 of that instrument, " to make all laws which " should be necessary and proper for carrying into execution the "powers delegated to them, and all other powers vested in the "government of the United States, or in any department or of- "ficer thereof."  Hence it results that congress have the concurrent right of passing laws to protect the interest of the union, as to debts due to the government of the United States arising from the public revenue ; but in so doing, they cannot detract from the uncontroulable power of individual states to raise their own revenue, nor infringe on, or derogate from the sovereignty of any independent state.   Federalist Letters, Nos. 32, 33.   The consequences of a contrary doctrine are too obvious to be insisted upon.

The regulations and provisions in the bankrupt act of congress

of 4th April 1800, stongly fortify in my mind the construction I have made of the act of 3d March 1797. The 31st section declares that in the distribution of the bankrupt's effects, there shall be paid to every of the creditors a portion rate according to the amount of their respective debts. Creditors having judgments (on which executions have not been executed) statutes, recognizances, specialties or attachments are placed on one common footing ; "they shall be entitled to no more than a rateable "part of their debts, with the other creditors of the bankrupt." The 62d section saves the right of preference to prior satisfaction of debts due to the United States, or to any of them. And the 63d section provides, that nothing "contained in this act "shall be taken, or construed to invalidate or impair any lien "existing at the date of this act, upon the lands or chattels of "any person who may have become a bankrupt." The rights of the general government to priority of payment, and the rights of individual states, are contemplated as subsisting at the same time, and as perfectly compatible with each other. This only can be effected by giving preference to each existing lien, according to its due priority in point of time. I know of no other mode whereby the several conflicting claims can with justice be protected and secured.

This, if my construction be correct, narrows the question before us to a simple point, viz. To what periods, do the liens *relate in the present case? If the lien of the United [*260 States on the property of William Nicholls, can be traced no further back in this instance than the date of his mortgage to Henry Miller on the 9th June 1798, then the settlement on the 31st December 1797 of Nicholls's account by the comptroller and register general, being previous thereto, must necessarily give this commonwealth a preference ; but, if this lien refers to March 1797, then the United States would be entitled to priority.

Considering this point as a question merely between the United States and the commonwealth of Pennsylvania, I am of opinion for the reasons I have mentioned, that as to the contending parties, the lien did not attach earlier than the execution of the mortgage, and consequently, that the motion of the attorney general to take the money arising on the sheriff's sales, to the extent of the debts due from the defendant to the commonwealth, out of court, be granted.

SMITH, J. I fully concur. The reasoning from the 62d section of the bankrupt act did not at first carry the same weight in my mind as it now does.

BRACKENRIDGE, J. I wished to have seen the opinion of Judge WASHINGTON in the case of the United States *v.* Fisher and others, and also that delivered as the opinion of the majority of the judges of the Supreme Court, and to have compared both opinions with the constitution and the act of congress. I have

[Moore v. Heiss.]

had no such opportunity, and therefore have made out no regular opinion.

My mind has been led to the origin of the question before us. The constitution of the United States restrains the powers of the general government. Is this power to make such a law, or the exercise of it, given by the constitution? Is it necessary and proper to carry into execution the other delegated powers? I think not. Let the United States take care to appoint proper officers with due securities. I agree that the constitutionality of a law is not to be lightly condemned.

But admitting the constitutionality of the present act, has the public will been clearly and sufficiently expressed? Does the act extend to all persons indebted to the United States, or only to revenue officers? The claim of priority in payment of debts is a prerogative odious to all. It is strange how it found its way into a republican government! I lean against the construction of a priority in the United States; and I think the act only extends to revenue officers, and was never intended to dissolve a lien existing in a sovereign independent state. The word person in common parlance does not mean a body politic, a state in its collective capacity.

*261]

I never believed that there was any humiliation in a state by being subjected to suits by citizens of another state, or by citizens or subjects of any foreign state, in the courts of the United States; because I always deemed them on a level. The difficulty in my mind was, how the judgment against a state could be enforced. An amendment has taken place in this particular in the constitution of the United States.

If even the power was constitutionally delegated to congress to make a law, giving to the United States a preference in payment of debts over individual states, I cannot conceive that this right has been exercised by the expressions of the act of 3d March 1797; and upon the whole, I think the attorney general is intitled to take the money out of court.

Motion granted.

Referred to in 4 Yeates 316.