Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 8, 2019

**2019 CO 23**

**No. 16S413, *Calvert v. Mayberry*—Contracts—Attorney and Client—Attorney's Fees.**

The supreme court granted certiorari review to determine the preclusive effect of an attorney disciplinary hearing on a subsequent civil suit.  Because of admissions made by the party, the supreme court does not reach this question and vacates that portion of the court of appeals opinion.  The supreme court holds that when an attorney enters into a contract without complying with Rule 1.8(a), the contract is presumptively void as against public policy; however, a lawyer may rebut that presumption.  The supreme court additionally holds that the trial court did not abuse its discretion in awarding attorney's fees at the trial level because the record supports the court's finding that the case was groundless, frivolous, and brought in bad faith.  However, the supreme court holds that the issues raised on appeal were legitimately appealable issues and, as such, do not warrant an award of fees against the petitioner.  Therefore, the supreme court affirms the judgment of the court of appeals as to the merits on other grounds, affirms the award of attorney's fees at the trial level, and reverses the court of appeals' order remanding for a determination of appellate attorney's fees.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203
_____

**2019 CO 23**
_____

**Supreme Court Case No. 16SC413**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA1559
_____

**Petitioner:**

David R. Calvert,

v.

**Respondents:**

Diane L. Mayberry a/k/a Diane Marie Laba-Mayberry and Desiree L. Mayberry.
_____

**Judgment Affirmed in Part and Reversed in Part**
*en banc*
April 8, 2019
_____

**Attorneys for Petitioner:**
Gill & Ledbetter, LLP
Anne Whalen Gill
 *Castle Rock, Colorado*

**Attorney for Respondent Diane L. Mayberry:**
Eric M. James
 *Fort Collins, Colorado*

**Attorneys for Respondent Desiree L. Mayberry:**
Miller & Steiert, P.C.
Christopher J. Forrest
Gary M. Clexton
Stephen J. Woolsey
 *Littleton, Colorado*

**JUSTICE BOATRIGHT** delivered the Opinion of the Court.
**CHIEF JUSTICE COATS** dissents, and **JUSTICE SAMOUR** joins in the dissent.

¶1     David Calvert was disbarred for various ethical violations, including entering into an oral agreement with a client without complying with the requisite safeguards of Colorado Rule of Professional Conduct 1.8(a).  After being disbarred, Calvert sued his former client, Diane Mayberry, for breach of that same oral agreement, claiming that there was a contract between them.  The trial court granted Mayberry's motion for summary judgment, and the court of appeals affirmed.  Calvert now asks us to consider three questions related to this dispute: (1) whether an attorney who was found to have violated Rule 1.8(a) in a disciplinary proceeding is estopped from relitigating the same factual issues in a civil proceeding; (2) whether a contract between an attorney and a client entered into in violation of Rule 1.8(a) is enforceable; and (3) whether the trial court abused its discretion in awarding attorney's fees against Calvert after finding his lawsuit groundless and frivolous.[1]

---

[1] Specifically, we granted certiorari to review the following issues:

1. Whether the doctrine of issue preclusion can bar a disbarred attorney from relitigating in a civil suit against his former client factual issues decided by the attorney disciplinary hearing board, and whether the hearing board's finding that the attorney-plaintiff violated Rule 1.8(a) of the Colorado Rules of Professional Conduct constitutes a factual issue for purposes of issue preclusion.

2. Whether a contract between an attorney and his client that was formed in violation of Rule 1.8(a) of the Colorado Rules of Professional Conduct is void as against public policy.

3. Whether sanctions against the attorney for groundless and frivolous litigation stand.

3

¶2    First, because Calvert conceded that he could not relitigate whether he entered into an agreement with a client without meeting Rule 1.8(a)'s requirements, we decline to answer whether issue preclusion applies to those factual findings.  Second, we hold that when an attorney enters into a contract without complying with Rule 1.8(a), the contract is presumptively void as against public policy; however, a lawyer may rebut that presumption by showing that, under the circumstances, the contract does not contravene the public policy underlying Rule 1.8(a).  Finally, we hold that the trial court did not abuse its discretion in awarding attorney's fees at the trial level because the record supports the court's finding that the case was groundless, frivolous, and brought in bad faith.  But as to attorney's fees at the appellate level, because the questions of whether issue preclusion applied in this proceeding and whether a contract made in violation of Rule 1.8(a) is void as against public policy are legitimately appealable issues, we hold that appellate attorney's fees are not appropriate.

¶3    Therefore, we affirm the judgment of the court of appeals as to the merits on other grounds, affirm the award of attorney's fees at the trial level, and reverse the court of appeals' order remanding for a determination of appellate attorney's fees.

## I.    Facts and Procedural History[2]

¶4    When Mayberry's husband died, she retained Calvert to help her secure title in her name to the house that she and her husband jointly owned.  After Calvert successfully

---

[2] These facts are taken from the parties' filings and supporting affidavits.

secured title, Mayberry informed Calvert that she was planning to move out of the state and wished to sell her house. Purportedly to aid Mayberry, Calvert alleges in his complaint that he gave her approximately $193,000 in various increments to renovate the house. Despite testifying at the disciplinary hearing that he had no agreement with Mayberry,[3] Calvert alleged in this subsequent lawsuit that the parties agreed that Mayberry would repay Calvert the money from the proceeds of the house after she sold it. Calvert did not counsel Mayberry to seek independent legal advice before entering into this agreement, nor did he memorialize the agreement in writing.[4]

¶5 After Calvert gave the money to Mayberry, he approached the Weinhauers, another set of his clients, and suggested that they loan additional funds to Mayberry and then secure their loan with a deed of trust on Mayberry's house. The Weinhauers declined. Nevertheless, Calvert presented a promissory note and a deed of trust in favor of the Weinhauers to Mayberry for her signature; she signed both documents. After Mayberry signed the deed, Calvert recorded it without the Weinhauers' signatures or knowledge.[5]

¶6 After recording the deed, Calvert once again approached the Weinhauers. This time, Calvert attempted to persuade them to assign the deed to him or his company,

---

[3] At the disciplinary hearing, Calvert testified that Mayberry "could have taken the money and done whatever she wanted with it. I had no agreement with her at all."

[4] Calvert conceded these facts in his briefing to this court and at oral argument.

[5] At the time of the filing of this appeal, the Weinhauer deed of trust remained on Mayberry's house.

Calvert & Co., presumably to secure an interest in Mayberry's house. The Weinhauers once again declined. Unbeknownst to Calvert, after the deed of trust was recorded, Mayberry transferred title to the house to her daughter, who continues to own the house.

¶7 Calvert's actions, combined with other ethical violations, ultimately led to disciplinary proceedings and his eventual disbarment. Following his disbarment, Calvert filed a civil suit against Mayberry and her daughter (collectively, "Defendants"), seeking either repayment of the money he gave to Mayberry as damages on his breach-of-contract claim or an equitable lien on Mayberry's house. He also alleged that the daughter had intentionally interfered with his agreement with Mayberry, asserting that she had convinced Mayberry to transfer title to the house to her in order to deprive Calvert of his interest.

¶8 Defendants moved for summary judgment. Noting that the attorney discipline hearing board found that Calvert had violated Rule 1.8(a), Defendants argued that the doctrine of issue preclusion prevented Calvert from relitigating this finding. Defendants then argued that the Colorado Rules of Professional Conduct are an expression of public policy and that, because Calvert had violated Rule 1.8(a), the contract was void as against public policy. Finally, Defendants sought attorney's fees, arguing that Calvert's claims were groundless and frivolous.

¶9     The trial court granted Defendants' motion for summary judgment, finding that issue preclusion applied and that the alleged contract was void as against public policy.[6] It also issued sanctions of attorney's fees and costs against Calvert, finding it "disturbing" that when Calvert's original scheme to deprive Mayberry of her home led to his disbarment, he then turned to the court system, still hoping to benefit from his unethical conduct.

¶10    Calvert appealed.  As relevant here, he argued that (1) issue preclusion did not apply; (2) the contract was not void because the Rules of Professional Conduct have never been deemed an expression of public policy, and the Preamble to the Rules states that they do not give rise to a civil cause of action; and (3) sanctions were inappropriate because his lawsuit raised novel legal issues.  Defendants opposed Calvert's appeal and moved for appellate attorney's fees, arguing that Calvert pursued the appeal for the sole purpose of harassment or delay.

¶11    The court of appeals agreed with the trial court, holding that issue preclusion barred Calvert from relitigating his Rule 1.8(a) violation and that, because the underlying contract was made in violation of Rule 1.8(a), the contract was void as against public policy. *Calvert v. Mayberry*, 2016 COA 60, ¶¶ 23, 33, __ P.3d __.  The court of appeals also

---

[6] The trial court noted that even if issue preclusion did not apply, the only evidence submitted to the court regarding the existence of an oral agreement was "several statements given under oath by [Calvert] to the effect that he had no agreement, written or verbal, with Diane Mayberry regarding the money he gave her, but that he simply hoped she might repay him someday."

affirmed the trial court's award of attorney's fees, concluding that the evidence "support[ed] the trial court's determination that this case lacked substantial justification and that [Calvert] brought it in bad faith." *Id.* at ¶ 44. Regarding appellate attorney's fees, however, the court of appeals could not determine from the existing record whether Calvert filed his appeal for the sole purpose of harassment or delay. *Id.* at ¶ 51. It thus remanded the case to the trial court to make this determination and award fees consistent with its conclusion. *Id.*

¶12 We granted certiorari.

## II. Standard of Review

¶13 We review de novo whether a contract violates public policy. *See Bailey v. Lincoln Gen. Ins.*, 255 P.3d 1039, 1045 (Colo. 2011). We review a court's award of attorney's fees for an abuse of discretion and will reverse an award only if it is not supported by the evidence. *Spring Creek Ranchers Ass'n v. McNichols*, 165 P.3d 244, 246 (Colo. 2007).

## III. Law and Analysis

¶14 At the heart of this dispute is whether the alleged contract between Calvert and Mayberry is enforceable. Because Calvert conceded at oral argument that he could not relitigate whether he complied with Rule 1.8(a) and further admitted in his opening brief that he entered into an oral agreement with his client without advising her or memorializing the agreement, we decline to address the question of issue preclusion. Those facts are no longer in dispute. Hence, we begin our analysis by accepting Calvert's admission that he did not comply with Rule 1.8(a).

8

¶15 Next, we consider the enforceability of a contract entered into without complying with Rule 1.8(a). We hold that when an attorney enters into a contract without complying with Rule 1.8(a), the contract is presumptively void as against the public policy underlying the Rule. We further hold that an attorney may rebut this presumption by showing that, under the circumstances, the contract does not contravene the public policy underlying Rule 1.8(a).

¶16 Finally, we hold that the trial court did not abuse its discretion in awarding attorney's fees. However, appellate attorney's fees, for appeals pursued at both the court of appeals and this court, are inappropriate, as the appeals raised legitimate legal questions.

## A. Calvert's Admission That He Failed to Comply with Rule 1.8(a)'s Requirements

¶17 In determining that the oral agreement violated public policy, both courts below gave preclusive effect to the hearing board's finding that Calvert violated Rule 1.8(a). But we decline to determine whether issue preclusion applies to the board's findings, because Calvert admitted in his briefing before this court that he did not fulfill two of Rule 1.8(a)'s requirements and conceded during oral arguments that he could not relitigate whether he complied with Rule 1.8(a)'s requirements. This constitutes a judicial admission.

¶18 "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *Kempter v. Hurd*, 713 P.2d 1274, 1279 (Colo. 1986). In Calvert's opening brief to this court, he stated that "[h]e did

9

not advise [Mayberry] to seek independent legal advice about the loans and did not reduce any of their discussions to writing." Because Rule 1.8(a) requires lawyers to both advise their clients of the desirability of seeking independent legal advice and reduce their agreements to writing, Calvert's statement that he did neither of these is an admission that he did not comply with Rule 1.8(a). When asked at oral argument if Calvert could relitigate whether he complied with the requirements of Rule 1.8, Calvert's counsel replied that he could not.[7] Because Calvert admitted that he failed to comply with Rule 1.8(a)'s requirements, we need not reach the question of issue preclusion.

¶19 Now we turn to the question of whether the loan contract Calvert claims he entered into with Mayberry is enforceable.

## B. Enforceability of the Contract

¶20 To make that determination, we first consider whether Rule 1.8(a) is an expression of public policy. After concluding that it is, we hold that when an attorney enters into a contract without complying with Rule 1.8(a), the contract is presumptively void as against the public policy underlying the Rule. We further hold that an attorney may rebut this presumption by showing that, under the circumstances, the contract does

---

[7] The following exchange occurred:

Court: Does Mr. Calvert get to retry in this case that he entered into an agreement with a client without having advised the client, and all of the things that 1.8 requires, does he get to retry that?

Calvert's Counsel: No.

not contravene the public policy underlying Rule 1.8(a).  Finally, we apply this holding to the case at bar and conclude that the oral agreement Calvert entered into with Mayberry in violation of Rule 1.8(a) is presumptively void and, because the record shows that Calvert cannot rebut this presumption, the agreement is unenforceable.

### 1.  Rule 1.8(a) Is an Expression of Public Policy

¶21     Colorado courts recognize a strong policy of freedom of contract.  "Contracts between competent parties, voluntarily and fairly made, should be enforceable according to the terms to which they freely commit themselves."  *Ravenstar, LLC v. One Ski Hill Place, LLC*, 2017 CO 83, ¶ 12, 401 P.3d 552, 555 (quoting *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 75 (Colo. 1991) (Rovira, C.J., dissenting)).  Even so, a contract is unenforceable by either party if it is against public policy.  *See Russell v. Courier Printing & Pub. Co.*, 95 P. 936, 938 (Colo. 1908); *see also Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992) ("[It is] Colorado's long-standing rule that a contract violative of public policy is unenforceable . . . .").

¶22     Public policy "is that rule of law which declares that no one can lawfully do that which tends to injure the public, or is detrimental to the public good."  *Russell*, 95 P. at 938.  Although "[s]tatutes by their nature are the most reasonable and common sources for defining public policy," professional ethical codes may also be expressions of public policy.  *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996).  To qualify as an expression of public policy under *Mariani*, an ethical rule must (1) "be designed to serve the interests of the public rather than the interests of the profession," (2) "not concern merely technical matters or administrative regulations," and

11

(3) "provide a clear mandate to act or not to act in a particular way." *Id.* We now consider whether Rule 1.8(a) satisfies these three factors.

¶23 First, we must determine if Rule 1.8(a) is designed to serve the public or the profession. Rule 1.8(a) lays out the safeguards that an attorney must put in place before entering into a business transaction with a client:

> A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Because of the unbalanced nature of the attorney-client relationship, these safeguards are necessary to protect *the client*, as the "lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching" on the part of the attorney. Colo. RPC 1.8, cmt. 1. Moreover, Rule 1.8(a) applies to all personal transactions between the lawyer and client, but does not apply to "standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others," because "[i]n such transactions, the lawyer has no advantage in dealing with the client." *Id.*

12

¶24    Thus, Rule 1.8(a) is a prophylactic rule whose purpose is to protect clients—i.e., the public—from lawyers potentially wielding their inherent advantage and influence. While there may be an incidental benefit to the legal profession by ensuring public confidence in attorneys, Rule 1.8(a)'s primary purpose is to serve the interests of the public. Therefore, the Rule satisfies the first element of the *Mariani* test.

¶25    Second, we must ensure that Rule 1.8(a) does not concern merely technical or administrative matters. Rule 1.8(a) deals with the safeguards that must be put in place to protect the public as well as the integrity of the attorney-client relationship. This Rule is designed to protect clients from being taken advantage of in a financial transaction by someone with whom they share confidential information and on whom they rely for advice. Such substantive protection clearly is not technical or administrative. It instead ensures that lawyers do not exert undue influence over their clients. Indeed, compliance with this Rule is so important that violations can result in disbarment. *See* ABA Standard 4.31(b). Thus, Rule 1.8(a) satisfies the second element of the *Mariani* test.

¶26    Third, we must determine if Rule 1.8(a) provides a clear mandate to act (or not act) in a certain way. The rules within the Colorado Rules of Professional Conduct take one of three forms: (1) imperative rules, "cast in terms of 'shall' or 'shall not'"; (2) permissive rules, "generally cast in the term 'may'"; and (3) "[r]ules defin[ing] the nature of relationships between the lawyer and others." Colo. RPC, Preamble & Scope, [14]. Rule 1.8(a) is an imperative rule, stating that lawyers "*shall not* enter into a business transaction with a client" without complying with the Rule's requirements. (Emphasis added). As previously detailed, subsection (1) requires that terms be fair and reasonable to the client,

13

and fully disclosed in writing and in a manner the client can understand; subsection (2) requires that the lawyer advise the client, in writing, of the desirability of seeking independent counsel, and that the lawyer provide a reasonable time for the client to seek such counsel; and subsection (3) requires that the client give informed consent, in a signed writing, to both the essential terms of the transaction and the lawyer's role in the transaction. These requirements are set forth in clear and specific terms. Because Rule 1.8(a) clearly sets forth the requirements that an attorney *must* follow prior to entering into a business transaction with a client, Rule 1.8(a) contains a clear mandate to act in a certain way and thus satisfies the last element of the *Mariani* test.

¶27 Therefore, because Rule 1.8(a) is an ethical rule whose purpose is to protect the public, which does not pertain to technical or administrative matters, and whose mandate is clearly laid out, Rule 1.8(a) qualifies as an expression of public policy. *See Mariani*, 916 P.2d at 525. We now consider the legal consequences when a contract is entered into in violation of Rule 1.8(a).

## 2. Effect of a Rule 1.8(a) Violation

¶28 While this is an issue of first impression for this court, other states have addressed the public-policy implications of rules similar to Rule 1.8(a). Some states have held that contracts entered into in violation of such a rule are void. *See, e.g., Succession of Cloud*, 530 So. 2d 1146, 1150 (La. 1988); *Evans v. Luptak, PLC v. Lizza*, 650 N.W.2d 364, 370 (Mich. Ct. App. 2002); *Law Offices of Peter H. Priest, PLLC v. Coch*, 780 S.E.2d 163, 174 (N.C. Ct. App. 2015). These states focus on the violations of the ethical rule itself, rather than on the public policy expressed by the rule. But, as the supreme court of Washington recognized,

14

although "all [ethical rule] violations are in some way injurious to the public, not all [ethical rule] violations will render any related contract injurious to the public." *LK Operating, LLC v. Collection Grp., LLC*, 331 P.3d 1147, 1164 (Wash. 2014). As such, the court held "that a contract entered [into] in violation of [Rule] 1.8(a) may not be enforced unless it can be shown that notwithstanding the violation, the resulting contract does not violate the underlying public policy of the rule." *Id.* at 1165.

¶29 We find Washington's approach persuasive. Our Rule 1.8(a), like other prophylactic rules, was adopted to minimize the likelihood that a lawyer will take advantage of a client, whether purposefully or accidentally. But a lawyer may conceivably enter into a business transaction with a client that fails to comply with Rule 1.8(a)'s safeguards yet remains fair to the client. Hence, a holding that absolutely voids a contract for violating the Rule may actually harm the person it is designed to protect.

¶30 Accordingly, we hold that a contract entered into in violation of Rule 1.8(a) is presumptively void. However, because it is possible for a lawyer to enter into a contract in violation of Rule 1.8(a) without that contract offending public policy, this presumption is rebuttable. To rebut this presumption, a lawyer seeking to enforce the contract must show that the contract does not offend the public policy considerations underlying Rule 1.8(a).[8]

---

[8] The question of whether a client has to rebut a presumption that the contract is void to enforce a contract entered into in violation of Rule 1.8(a) is not before us. Therefore, we do not reach and express no opinion as to that question.

15

¶31    As discussed, Rule 1.8(a) expresses three main public policy considerations, espoused in its three subsections: (1) a fair, fully-disclosed transaction; (2) a properly-counseled client; and (3) no improper influence by the attorney. Hence, to enforce a contract entered into without complying with Rule 1.8(a), the attorney must demonstrate by a preponderance of the evidence that (1) the contract's terms are fair and reasonable, (2) the terms of the agreement are unambiguous, and (3) there was no undue influence or overreaching. The requirement that the terms be fair and reasonable ensures that the transaction is the equivalent of an arms-length transaction with a disinterested third party. The requirement that the terms be unambiguous serves the policy that the transaction is fully disclosed. Finally, the requirement that there be no undue influence or overreaching serves the dual purpose of ensuring that the attorney's inherent advantage over the client is not abused and that the policy of a properly counseled client is satisfied. If the lawyer can make these showings, then the contract does not violate the public policy considerations expressed by Rule 1.8(a) and is enforceable. To be sure, these requirements closely track the actual requirements of Rule 1.8(a). However, the protective concerns of Rule 1.8(a) are weighty and should not be easily overcome. Instead, our framework allows technical infirmities to be overcome when an attorney has followed the spirit of the Rule.

¶32    Calvert argues that the Preamble & Scope section of the Colorado Rules of Professional Conduct requires a different result because it states that the "[v]iolation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached." Colo. RPC,

16

Preamble & Scope, [20]; *see also Olsen & Brown v. City of Englewood*, 889 P.2d 673, 676 (Colo. 1995) (recognizing that the "rules are in place to provide guidance in the attorney-client relationship and to serve as a mechanism of internal professional discipline"). But our holding today does neither of these things. We are not concluding that a client may sue a lawyer for violating Rule 1.8(a); nor are we concluding that violating the Rule creates a presumption in a separate civil action that a lawyer breached his or her duty. Instead, we are merely recognizing that Rule 1.8(a) is an expression of public policy, meaning that a contract entered into in violation of the Rule is presumptively void.

¶33     Accordingly, the contract is unenforceable unless the lawyer can demonstrate that it did not offend the policy goals underlying the Rule.[9] We now apply our framework to the facts of this case.

### 3.  Application

¶34     It is undisputed that Calvert gave money to Mayberry. What is not clear, however, is why he gave her the money. Was it a gift or a loan? At different times, Calvert has said yes to both. In his sworn testimony at the disciplinary hearing,[10] Calvert stated that there was no agreement and that he "never asked [Mayberry] for a nickel back." In

---

[9] Traditional contract defenses such as incapacity, duress, undue influence, and fraud in the inducement are affirmative defenses; as such, the client would bear the burden of proving these defenses. *See generally Trimble v. City & Cty. of Denver*, 697 P.2d 716 (Colo. 1985); *Hanks v. McNeil Coal Corp.*, 168 P.2d 256 (Colo. 1946); *Barrows v. McMurtry Mfg. Co.*, 131 P. 430 (Colo. 1913); *Lighthall v. Moore*, 31 P. 511 (Colo. App. 1892).

[10] Mayberry submitted transcripts of Calvert's sworn testimony in support of her motion for summary judgment.

contrast, Calvert's complaint alleged that the money was given as part of an oral agreement that was "essentially a joint venture," and he brought a claim for breach of contract. Both cannot be true. However, under these circumstances, the answer is irrelevant. The result is the same in either event.

¶35 To begin, if we were to accept Calvert's prior position that the money was given as a gift, then Calvert has no legally enforceable claim to the money. On the other hand, if (as Calvert currently claims) the money was a loan per an oral agreement, then his conduct was governed by Rule 1.8(a). And—recognizing Calvert's admission that he neither advised Mayberry to seek independent counsel nor memorialized the agreement in writing—the oral agreement violated Rule 1.8(a) and was thus presumptively void as against public policy.

¶36 Because we are creating a rebuttable presumption for the first time, we would normally remand the case for Calvert to present evidence rebutting the presumption. But the record makes plain that this would be impossible.

¶37 To rebut this presumption, Calvert would have to show that (1) the terms of the agreement were fair and reasonable, (2) the terms of the agreement were unambiguous, and (3) he did not overreach or unduly influence Mayberry into entering into the agreement.

¶38 In his complaint, Calvert alleges that the money was given to Mayberry "in contemplation of the equity of [Mayberry's] house," but there is no indication as to what, if any, interest rate Mayberry would be paying or what the repayment schedule would look like. Calvert gave the money to Mayberry in small increments, and there is no

18

indication as to the maximum amount Calvert was willing to give her. Nor is there any alternate method of repayment should Mayberry decide not to sell the home, as actually occurred here. Calvert himself states that he loaned Mayberry approximately $193,000 without ensuring that even the most basic terms of the agreement were agreed upon. Most importantly, the alleged agreement was never memorialized and without knowing what the terms of the agreement were, there is no way to determine if they were fair and reasonable; they certainly were not unambiguous. Because Calvert cannot show that the terms of the transaction are fair and reasonable, or that they are unambiguous, the presumption cannot be rebutted and the agreement is unenforceable. As a result, we need not reach the third part of the test and determine if there was undue influence exerted by Calvert.

¶39 Having determined that the oral loan agreement is void as against public policy, we now turn to the propriety of awarding attorney's fees.

### C. Attorney's Fees

¶40 Calvert's original complaint brought claims against Defendants for breach of contract, foreclosure of an equitable lien, civil conspiracy for fraudulent transfer, false representation, and intentional interference with contractual obligations. After granting Defendants' motion for summary judgment, the trial court awarded attorney's fees, finding that Calvert's claims lacked substantial justification and were brought in bad faith. On appeal, the court of appeals affirmed the fee award, and it remanded the case to the trial court to determine whether awarding fees at the appellate level was appropriate. We now review the propriety of those decisions.

19

¶41    First, we hold that the record supports the trial court's award of attorney's fees. We further hold that, while the initial action lacked substantial justification, neither of Calvert's appeals was frivolous, meaning that awarding fees at the appellate level is inappropriate.

### 1.  Attorney's Fees at the Trial Level

¶42    Colorado law provides that a court shall assess attorney's fees against a party if the party brought an action that lacked substantial justification or was for the purpose of delay or harassment.  § 13-17-102(4), C.R.S. (2018).  An action lacks substantial justification when it is "substantially frivolous, substantially groundless, or substantially vexatious." *Id.*

¶43    Here, Calvert sued to enforce an agreement that, by his own admission, has no definite terms and was not reduced to writing.  Moreover, Calvert supplied no affidavits saying that there was an agreement, while Mayberry provided several affidavits saying that there was not an agreement.  In fact, Calvert testified at the disciplinary hearing that he "had no agreement with [Mayberry] at all."  This suggests that his claims were groundless and frivolous.  And the decision to switch gears—first claiming that no agreement existed and then suing for breach of contract—is highly suggestive of bad faith.  Thus, the record supports the trial court's award of attorney's fees, and we will not disturb the award on appeal.

### 2.  Attorney's Fees at the Appellate Level

¶44    Defendants requested further sanctions on appeal, arguing that Calvert's appeals were frivolous and brought for the sole purpose of delay or harassment.  They argue that

20

Calvert has continuously filed appeals to delay removing the Weinhauer deed of trust from Mayberry's home, as ordered by the trial court.

¶45     An appeal may be either frivolous as filed or frivolous as argued. *Castillo v. Koppes-Conway*, 148 P.3d 289, 292 (Colo. App. 2006). It is frivolous as filed when there are no legitimately appealable issues because the judgment below "was so plainly correct and the legal authority contrary to the appellant's position so clear." *Id.* (citing *Dungaree Realty, Inc. v. United States*, 30 F.3d 122, 124 (Fed. Cir. 1994)). Even if there are legitimately appealable issues, an appeal may still be frivolous as argued if the appellant "fail[s] to set forth . . . a coherent assertion of error, supported by legal authority." *Id.*

¶46     Both courts below held that issue preclusion barred Calvert from relitigating whether he violated Rule 1.8(a) and that Rule 1.8(a) was an expression of public policy that voided the contract. Because these are both issues of first impression, we cannot say that the trial court was "plainly correct" or that the legal authority contrary to Calvert's position was "clear." Thus, even though Calvert's underlying claims were groundless, his appeal was not frivolous as filed.

¶47     As to the frivolousness of his arguments, Calvert presented coherent legal arguments to both appellate courts and effectively addressed Defendants' counterarguments. Calvert's briefs properly addressed the standard of review and cited relevant case law, and Calvert's attorney presented the arguments in a reasonable manner at oral argument. While Defendants note that Calvert made some unsupported factual assertions and violated some rules of procedure during the appeal, this behavior does not rise to the level of frivolous as argued. *See id.* at 291–93 (holding that an appeal

21

is frivolous as argued when the appellant cites minimal and irrelevant authority, violates multiple rules of procedure, and "presents tortured rhetoric" rather than "setting forth a cogent argument").

¶48 We therefore decline to award attorney's fees on appeal.

## IV. Conclusion

¶49 First, because Calvert's counsel conceded at oral argument that he could not relitigate whether he complied with Rule 1.8(a)'s requirements, we decline to answer whether issue preclusion applies.[11] Second, we hold that when an attorney enters in a contract without complying with Rule 1.8(a), the contract is presumptively void as against public policy; however, the attorney may rebut that presumption by showing that, under the circumstances, the contract does not contravene the public policy underlying Rule 1.8(a). We also affirm the trial court's award of attorney's fees at the trial level. However, we decline to award such fees on appeal.

¶50 For the foregoing reasons, we affirm the judgment of the court of appeals as to the merits on other grounds, affirm the award of attorney's fees at the trial level, and reverse the court of appeals' order remanding for a determination of appellate attorney's fees.

**CHIEF JUSTICE COATS** dissents, and **JUSTICE SAMOUR** joins in the dissent.

---

[11] Because we decline to reach the question of issue preclusion, we vacate the court of appeals' holding regarding that issue.

CHIEF JUSTICE COATS, dissenting.

¶51 I do not agree with the majority that the ethical rules promulgated by this court for the supervision of the practice of law are in any way capable of expressing the public policy of the jurisdiction. Nor do I agree that a violation of those rules, even if they could be a source of public policy, could have the effect on contract formation envisioned by the majority. And finally, although I applaud its decision to vacate the intermediate appellate court's extension of the doctrine of collateral estoppel, or issue preclusion, to bar the litigation of facts previously determined by a lawyer disciplinary panel, I am not as sanguine as the majority about its own ability to dodge the question and still reach the conclusion it does in this case. Because I not only disagree with the majority's reasoning and understanding of our prior decisions, but also fear we will come to regret injecting our own rules governing the practice of law into questions of civil liability, I respectfully dissent and outline my concerns.

¶52 To begin, I do not agree that our Rules of Professional Conduct can be viewed as a source of public policy for purposes of contract liability, nor do I believe we have ever suggested anything of the kind. In *Rocky Mountain Hospital & Medical Service v. Mariani*, heavily relied on by the majority, we narrowly held that under limited circumstances, professional ethical codes, just as constitutional or statutory provisions themselves, may be looked upon as a source of public policy for purposes of the public policy exception to what would otherwise be an employment at-will. 916 P.2d 519, 525–26 (Colo. 1996). In that case, we specifically found that "[t]he essence of the public policy exception is that an employee will have a cognizable claim for wrongful discharge 'if the discharge of the

employee contravenes a clear mandate of public policy,'" *id.* at 523–24 (quoting *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992), and that Rule 7.3 of the Colorado State Board of Accountancy Rules of Professional Conduct, entitled "Integrity and Objectivity," 3 Colo. Code Regs. 705-1 (1991), "represents a clear mandate of public policy *for purposes of establishing a claim for wrongful discharge in violation of public policy*," *Mariani*, 916 P.2d at 526 (emphasis added). In that case, we therefore held, at most, that proof of an employee's discharge for complying with professional ethical rules may sometimes be sufficient to make out a claim for wrongful discharge—not that failing to comply with professional ethical obligations constitutes a violation of public policy capable of invalidating an otherwise valid contract.

¶53 Furthermore, to the extent considerations of public policy have been recognized to render a contractual agreement unenforceable, their effect has been limited to nullifying particular terms that are offensive to public policy. *See* Restatement (Second) of Contracts § 178 (Am. Law Inst. 1981) ("A *promise* or *other term* of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the *enforcement of such terms*."(emphasis added)); *see also, e.g.*, *Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 727–28 (Colo. 2010) (exculpatory agreement releasing manufacturer from strict products liability held to violate public policy); *Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 493 (Colo. 1998) (consent to sue clause in auto insurance policy violated public policy); *Martinez v. Cont'l Enters.*, 730 P.2d 308, 316 (Colo. 1986) (public policy favoring possession by mortgagor prior to foreclosure prevailed over

2

contrary contractual provision in deed of trust). I am unaware (and the majority does not suggest) that either this court or the court of appeals has ever approved a public policy defense to contract formation until now, perhaps because traditionally accepted defenses to contract formation already incorporate such policy-related concerns as incapacity, duress, and undue influence, as well as mistake, misrepresentation, and fraud. It is far from clear to me why the majority considers these long-established defenses inadequate to protect law clients, regardless of their sophistication and capability, from forging agreements with their attorneys, and instead feels it necessary to effectively extend a presumption of undue influence whenever the attorney fails to fully comply with the Rules of Professional Conduct, notwithstanding the Rules' own express admonition that a violation shall not create any presumption that a legal duty has been breached. *See* Colo. RPC, Preamble & Scope, [20].

¶54 Although I therefore find problematic enough the creation of a new defense to contract formation based on the failure of a contracting party to comply with professional ethical codes, I am particularly concerned about creating a new contract defense based on rules promulgated by this court in the exercise of its constitutional authority to supervise the practice of law in the jurisdiction. This court has jealously guarded its authority over the practice of law, not only promulgating the rules that govern the ethical practice of the law but also designing the machinery, including specific requirements and procedures, for being admitted, remaining in good standing, and being disqualified from the practice of law. *See People v. Kanwal*, 2014 CO 20, ¶ 6, 321 P.3d 494, 495–96. Unlike professional ethical codes promulgated according to the State Administrative Procedure

3

Act, on the basis of authority expressly delegated by the General Assembly, like the Colorado State Board of Accountancy Rules of Professional Conduct, *see* §§ 12-2-101 to -104, C.R.S. (2018), which in *Mariani* we compared to sources of public policy like statutory and constitutional provisions, 916 P.2d at 525–26, the Colorado Rules of Professional Conduct are promulgated by this court, pursuant to its exclusive constitutional authority to supervise the practice of law, rather than according to any statutorily approved administrative procedures.

¶55    While the court of appeals has at times relied on the Rules of Professional Conduct as a source of public policy strictly for the purpose of interpreting engagement contracts relative to attorney fee provisions and exclusion from malpractice claims, *see, e.g.*, *S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein*, 2014 COA 171, ¶¶ 1, 14–15, 343 P.3d 1044, 1045, 1047–48 (public policy codified in Colo. RPC 1.5(a) requires courts to impose a reasonableness requirement on attorney fee-shifting provision in employment contract); *Norton Frickey, P.C. v. James B. Turner, P.C.*, 94 P.3d 1266, 1266–67 (Colo. App. 2004) (contract to apportion attorney fees upon an attorney's departure from a law firm was not contrary to this policy embodied in Colo. RPC 1.5(a)); *Roberts v. Holland & Hart*, 857 P.2d 492, 495–96 (Colo. App. 1993) (contractual assignment of legal malpractice claims contravenes public policy embodied in the Colorado Rules of Professional Conduct that attorneys owe clients duties of loyalty and confidentiality), this court has not even gone that far.  Unlike the majority, I see no merit in implicating delicate separation of powers questions by interpreting our Rules of Professional Conduct to affect matters of substantive law, rather than merely the practice of law.

4

¶56 Finally, because of the unique purposes and procedures of attorney discipline, I would make clear that apart from the fact of their occurrence and their impact on an attorney's status with regard to the practice of law, those procedures cannot affect his rights or liabilities in civil or criminal proceedings. If for no other reason, I believe the unique procedures provided for alleging and proving disciplinary violations, before a panel the majority of whom are lay members of the bar, preclude application of the doctrine of collateral estoppel, or issue preclusion, to subsequent civil or criminal proceedings. While I appreciate the majority's attempt to avoid this question by finding that it was unnecessarily decided by the intermediate appellate court, I fail to see how any admission before us or allegation of the complaint below resolves the question, in light of the majority's newly created voidability standard, whether or not the contract in this case is actually void. Without (at least implicitly) relying on the evidence and findings of the Hearing Board, and without remanding for factual determinations concerning the communications and understanding of the parties, I fail to see how, despite its protestations to the contrary, the majority does not simply hold that in the absence of compliance with Rule 1.8's requirement for a writing, any contract between an attorney and client is simply void.

¶57 I find the majority's creation of a new public policy defense to contract formation, based on professional ethical codes in general, and the Colorado Rules of Professional Conduct in particular, to be especially unfortunate where it seems so unnecessary. If the facts upon which the majority relies to find it impossible for Calvert to overcome the presumption are indeed conceded, it is difficult to understand why Mayberry would not

5

be equally entitled to summary judgment on the basis of some of the aforementioned well-accepted defenses to contract formation, without reference to public policy at all; and even if not undisputed for purposes of summary judgment, proof of these defenses at trial would appear to be easily accomplished. Even if I did not so strongly reject the majority's reasoning, I would be disinclined to make new law with the potential for such broad and unpredictable impact, without considerably greater cause.

¶58    I therefore respectfully dissent.

I am authorized to state that JUSTICE SAMOUR joins in this dissent.