23CA1854 Marriage of Fink 10-31-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1854
Elbert County District Court No. 22DR37
Honorable Theresa Slade, Judge

In re the Marriage of

Jeremy Joseph Fink,

Appellant,

and

Julie Mae Fink,

Appellee.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SCHUTZ
Tow and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 31, 2024

Carrigan and Cotter Law, LLP, Kimberley A. Cotter, Lakewood, Colorado, for
Appellant

The Law office of Heather Mitchell & Associates, LLC, Heather M. Mitchell,
Monument, Colorado, for Appellee

¶ 1    This appeal arises from the district court's division of marital property following the dissolution of the marriage between Jeremy Joseph Fink (Jeremy) and Julie Mae Fink (Julie).[1]  Jeremy appeals the district court's judgment.  We affirm.

## I.    Background

¶ 2    Jeremy and Julie were married in 2006.  They separated in 2022 after eighteen years of marriage.  The couple share three minor children.  At the permanent orders hearing, the parties reached several agreements about property division, including motor vehicles, the marital home, and a $60,000 money advance from Jeremy to Julie.

¶ 3    Jeremy had the marital home appraised.  At the hearing, the appraiser testified that the property was worth $710,000 on the date of his appraisal.  He also testified the house needed several repairs.  At the close of the hearing, the parties informed the court that they had "agreed on issues regarding their property, both real and personal" and would submit their stipulation to the court.

---

[1] Because the parties share a last name, we refer to them by their first name.  We mean no disrespect by doing so.

Counsel for the parties summarized some of these stipulations verbally. However, the parties did not file written stipulations.

¶ 4 In its written final order, the district court made thorough findings of fact and conclusions of law. The order set forth the total value of the marital property, the property division, maintenance, and child support, and required Jeremy to pay Julie an equalization payment of $201,616.18.

¶ 5 Jeremy appeals the amount of the equalization payment the court ordered him to make to Julie. Specifically, Jeremy objects to four underlying determinations the court made to establish the equalization payment: (1) the value of the marital residence, (2) the allocation of the parties' retirement accounts, (3) the allocation of the parties' vehicles, and (4) the value of the livestock and farm related equipment. Jeremy also disputes the court's maintenance and child support awards, and more specifically, the amount of income attributed to Julie for purposes of calculating those awards.

## II. Standards of Review and Applicable Law

¶ 6 Generally, the district court has "broad discretion to determine an equitable division of the marital assets and debts." *In re Marriage of Capparelli*, 2024 COA 103, ¶ 7. We will not disturb its

decision unless the court abused its discretion. *Id.* A court abuses its discretion if its decision is "manifestly arbitrary, unreasonable, or unfair," or based on a misapplication of the law. *Rains v. Barber*, 2018 CO 61, ¶ 8; *Margerum v. People*, 2019 CO 100, ¶ 9.

¶ 7 When dividing a marital estate, a district court must first determine whether an asset or debt is marital or separate. § 14-10-113(1), C.R.S. 2024. The court must enter findings as to the approximate value of the marital property and debt and divide the marital property in a way that is equitable, but not necessarily equal. *Capparelli*, ¶ 9.

¶ 8 A court is required to adopt the written stipulations of parties regarding division of marital property, unless the agreement is unconscionable in view of the economic circumstances of the parties and any other relevant evidence. § 14-10-112(2), C.R.S. 2024; *In re Marriage of Weck*, 706 P.2d 436, 437-38 (Colo. App. 1985). Stipulations are unconscionable when there is "fraud, overreaching, concealment of assets, or sharp dealing." *In re Marriage of Thornhill*, 200 P.3d 1083, 1085 (Colo. App. 2008), *aff'd in part and rev'd in part*, 232 P.3d 782 (Colo. 2010). However, even in the absence of such findings, the court must still determine

3

whether the agreement is "fair, just, and reasonable" based on the parties' economic circumstances. *Id.*

### III. Equalization Payment

#### A. Value of the House

¶ 9 Jeremy asserts that the district court erred in its valuation of the house. We discern no abuse of discretion.

¶ 10 The district court adopted the fair market value of the house provided by Brad Brooks, who was hired and qualified as an expert appraiser by Jeremy's counsel. Specifically, the court adopted Brooks's written opinion provided in the formal appraisal: the market value of the property as of June 5, 2023,[2] was $710,000. Jeremy argues that the district court should have deducted the cost of repairs the marital property needed when establishing the value of the residence.

¶ 11 Brooks calculated the property's fair market value using three nearby "comparable" properties. He also considered the condition of the marital property and the cost to bring it to average condition.

---

[2] The final orders hearing was held July 24, 2023.

¶ 12     Brooks had included the following note as part of an addendum to his appraisal:

> Estimated Cost to Cure:
>
> Douglas County Septic and Honeybee Pumping Service both advised that the septic tank was cracked and needed replaced at a cost of approximately $9,000. Douglas County Septic advised the leach field was failing. Cost to add a leach field was $2,000 for an engineer plus $20,000 depending on the results of soil samples. Carpet needs replaced $10,000. Deck replacement is $4,500. For an estimated total Cost to Cure of $45,500.

¶ 13     None of these estimates were admitted into evidence at the permanent orders hearing, and no contractors were called to verify or support the estimates.

¶ 14     In response to question from Jeremy's counsel, Brooks testified that "it was a total of around $45,000 that would need to be spent to even get to $710,000. If you just sold [the house] as is, then you can just deduct $45,000 from the $710,000." Brooks also testified that some of the repairs, such as those needed for the septic tank, would have to be completed before the property could be sold. Brooks was only qualified as an expert appraiser, not as a

construction contractor or estimator.  And on cross-examination, he

equivocated on the repair estimate:

> Q.  How is your track record on
> recommendations for repairs.  Like, in this
> case, you recommended about $45,000 in
> repairs in relation to the benefit that actually
> — that the parties, when they're selling or
> valuing the property actually received?  Do you
> — how's your accuracy on that?
>
> A.  That's a good question, but it's tough to
> answer.  Beauty is in the eye of the buyer,
> right?  So it would depend on the motivations
> at that time, the competition, if there's any
> other properties —

¶ 15    Brooks's testimony concerning the cost-benefit of the identified

repairs was equally equivocal:

> Q.  So you gave an amount of $45,000, which
> obviously means it could go a little higher, or
> go — could go under.  Is there a range that you
> can —
>
> A.  These type of improvements — let's — the
> septic tank, I mean, that is Colorado Law.
> That has to be fixed before any sale and it
> could be twice that.  I don't know.  They don't
> even know until they get in there and dig in
> there and find out what's going on.
>
> . . .
>
> I think you could — in my opinion, you could
> count on getting your money back — possibly
> twice your money.  I don't know.  It's —
> depends on the market, but you'd at least get

6

> your money back and have a lot more marketable property to sell if you just did these items.

¶ 16    Based on Brooks's testimony, the district court gave Jeremy the option of selling the property, with the parties equally sharing the cost of any necessary repairs and the resulting sale proceeds. Alternatively, the court noted that if Jeremy wanted to retain the property, its value would be set at $710,000. Jeremy elected to retain the property.

¶ 17    Given the content of Brooks's appraisal and his testimony, coupled with the uncertain cost and potential return associated with the repairs, we cannot say the court abused its discretion by valuing the property at $710,000. *See In re Marriage of Jaeger*, 883 P.2d 577, 580 (Colo. App. 1994) (court does not abuse its discretion when a ruling has record support).

### B.    Retirement Accounts

¶ 18    Jeremy also argues that the district court erred by including the parties' retirement accounts on the marital property spreadsheet. We see no error.

¶ 19    The parties had five retirement accounts between them. The court determined that about a quarter of Jeremy's Denver Police

Department pension ($141,950) was his separate property. No one contests that determination.

¶ 20　The court found that the remainder of the parties' retirement accounts were marital property. The total value of the marital property accounts was $446,484.16. Of that total, $442,087.24 was in an account in Jeremy's name; the remaining $4,391.16 was in an account under Julie's name.

¶ 21　Based on their written closing arguments, the court noted that both parties requested that the retirement accounts be "divided as they [were] titled." Jeremy contends that the effect of this stipulation was that each party would retain the funds in the accounts in their name and would have no award of the funds in the accounts in the other party's name. In contrast, Julie argues that the stipulation merely meant that the title to the accounts would remain in the same names but the funds in both accounts would be treated as marital property and equitably divided by the court.

¶ 22　In its permanent orders, the district court noted:

> ***Retirement Accounts:*** The parties have five
> retirement accounts. . . . The parties request
> the retirement accounts be divided as they are

8

titled. This results in a significant imbalance when the Court looks only at the retirement accounts. . . .

However, this is the request of the parties, and both are represented by counsel. When the *Court looks at the overall property division, which is attached, including the equalization payment, the Court will accept the stipulation.*

¶ 23 (Emphasis added.) In accordance with these findings, the court accepted the parties' stipulation, allowing them to retain the accounts in their names, but included the value of the accounts (less Jeremy's premarital portion) on the marital property spreadsheet and equalized the overall distribution of the value of the marital estate by requiring Jeremy to make an equalization payment.

¶ 24 The district court explained its equalization payment as follows:

> [Jeremy] retains $695,904.67 in property and [Julie] with $434,288.49 (including her share of the proceeds from the sale of the house). To balance this disparity, Petitioner owes Respondent an equalization payment of $261,616.18. Because he has already paid [Julie] $60,000.00 . . . , the total payment from Petitioner to Respondent is $201,616.18.

¶ 25    Thus, the court effectuated the parties' stipulation by allowing the parties to retain the retirement accounts in their own name. At the same time, the court effectuated an equitable distribution of the marital estate by including the retirement accounts in the marital property spreadsheet and requiring Jeremy to make the equalization payment to balance the equity of the estate between the parties. We perceive no abuse of discretion in treating the retirement account balances accrued during the marriage as marital property.

¶ 26    Indeed, even if the parties had intended a different result, the district court still would not have abused its discretion by incorporating the value of the retirement accounts in the equalization payment because to do anything other than that would have resulted in a grossly unfair division of the marital estate. *See* § 14-10-112(2).

C.    Livestock, Crops, and Farm Equipment

¶ 27    Jeremy also argues the district court erred by valuing the livestock, crops, and farm equipment at $2,600. We note the total equity in the marital estate exceeded $868,000. The disputed $2,600 represents less than 0.3% of the marital estate. Given its

10

minimal impact on the distribution of the marital estate, we decline to address this contention. *See* C.R.C.P. 61 (instructing courts to disregard any error or defect "which does not affect the substantial rights of the parties"); *In re Marriage of Zappanti*, 80 P.3d 889, 893 (Colo. App. 2003) ("An error affecting only a small percentage of the overall marital estate is harmless.").

### D. Vehicles

¶ 28    Finally, Jeremy argues the district court erred by including the vehicles acquired during the marriage on the marital property spreadsheet.

¶ 29    The total value of the marital property vehicles was $72,861. Prior to the final orders hearing, the parties put the Ford Expedition (worth $5,000) in Julie's name and Jeremy paid her $10,000. Jeremy contends on appeal that the $10,000 payment was in exchange for him receiving all other marital vehicles and their value (approximately $67,821). He also argues that the district court is making him "pay twice" for the value of the cars by including their value in the equalization payment calculation because he already paid the $10,000. We reject these contentions.

¶ 30     In its permanent orders, the district court acknowledged that Jeremy had already paid Julie $10,000 and credited him for that payment on the marital property spreadsheet. In addition, the court allocated the Expedition to Julie and debited her its $5,000 value on the spreadsheet.

¶ 31     Had the district court awarded Julie only $10,000 and the Expedition (a total vehicle value of $15,000) and the remaining value of the vehicles to Jeremy ($57,861), it would have resulted in a substantial inequity. Therefore, the district court did not abuse its discretion when it included all the marital vehicles on the marital spreadsheet because it also debited Julie the $5,000 value of the Expedition, credited Jeremy with the $10,000 advance he made to Julie, and, consistent with the parties' stipulation, allowed Jeremy to retain title to all marital vehicles other than the Expedition.

IV.   Julie's Income

¶ 32     Jeremy argues that the district court did not properly calculate Julie's income. We see no abuse of discretion.

12

## A.     Preservation

¶ 33     Julie claims that the issue of her income was not properly preserved.

¶ 34     To preserve an issue for appeal, the issue must be brought to the attention of the trial court and the trial court must have the opportunity to rule on it. *Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010).  Here, the issue of Julie's employment was discussed by both Jeremy and Julie before the district court.  Jeremy did not object to or contradict Julie's testimony regarding her employment during the hearing.  The court made specific findings regarding Julie's income and her ability to find employment.  Given that it was part of the hearing before the district court and the court made findings on her income, we conclude the issue is adequately preserved. *Id.*

## B.     Standard of Review and Applicable Law

¶ 35     A court needs to determine the parties' incomes because their incomes are used to calculate child support for any minor children and any spousal maintenance award.  § 14-10-114(3)(a)(I)(A), (8)(a)(II), C.R.S. 2024 (maintenance); § 14-10-115(1)(b)(I), (3)(c), C.R.S. 2024 (child support).  If a party is voluntarily unemployed or

underemployed, the district court may calculate child support and maintenance based on that party's potential income. § 14-10-114(8)(c)(IV) (maintenance); § 14-10-115(5)(b)(I) (child support). Potential income is the amount the party could earn commensurate with the party's demonstrated earning ability. *In re Marriage of Tooker*, 2019 COA 83, ¶ 26. A district court may consider several factors, "including the party's historical income, education, and work experience," and we review its resolution of this factual inquiry for an abuse of discretion. *Id.* at ¶¶ 26-27.

### C.    Analysis

¶ 36    During the permanent orders hearing, Jeremy testified that Julie currently worked at a part-time seasonal job but had primarily been a stay-at-home parent during their marriage. He also testified that she had training as a phlebotomist and a certified nursing assistant and would be able to work a full-time job and still care for the kids. Julie testified that she currently worked part time at a school and would have difficulty finding more than seasonal or part-time work near where they lived, and that she lacked reliable transportation to more distant locations.

¶ 37    The court determined Julie's income was approximately $1,614 per month, based on an hourly wage of $14.00 at thirty hours per week.  This calculation was based on Julie's current part-time employment wage.  In making this calculation, the court implicitly rejected Jeremy's argument that Julie was voluntarily underemployed.  Given the parties' testimonies and Julie's demonstrated work history, we cannot conclude that the district court abused its discretion by determining Julie's income.

## V.    Julie's Claim for Attorney Fees

¶ 38    Julie argues that Jeremy's appeal is frivolous, and therefore she should be awarded her attorney fees under C.A.R. 38(b).

¶ 39    Appeals can be frivolous in two ways: frivolous as filed or as argued.  *Calbert v. Mayberry*, 2019 CO 23, ¶ 45.  An appeal is frivolous as filed if the judgment from the court below is "so plainly correct and the legal authority contrary to appellant's position [is] so clear that there is really no appealable issue."  *SG Ints. I, Ltd. v. Kolbenschlag*, 2019 COA 115, ¶ 42.  An appeal is frivolous as argued if the "appellant commits misconduct in arguing the appeal."  *Id.*

¶ 40    Jeremy's appeal was not frivolous as filed.  Simply because we did not find the district court abused its discretion does not mean the district court was so "plainly correct" in its determinations that there was no appealable issue.  Nor was Jeremy's appeal frivolous as argued because neither Jeremy nor his attorney demonstrated any misconduct during the appeals process.

¶ 41    Without evidence that Jeremy's appeal was frivolous, we decline to award Julie attorney fees on appeal.

### VI.    Disposition

¶ 42    The district court's judgment is affirmed.

JUDGE TOW and JUDGE PAWAR concur.