1
 2026 CO 46 Mary Ann Moreno, Plaintiff: v. Circle K Stores, Inc. Defendant: No. 25SA134Supreme Court of Colorado, En BancJune 15, 2026

 Certification of Question of Law United States District Court
 for the District of Colorado Case No. 22-cv-02327-NYW-STV

 Attorneys for Plaintiff: Rathod Mohamedbhai LLC Virginia Hill
 Butler Iris Halpern Matthew Cron Denver, Colorado

 Attorneys for Defendant: Littler Mendelson, P.C. Thomas W.
 Carroll Nicholas Hankins Denver, Colorado

 JUSTICE BERKENKOTTER delivered the Opinion of the Court, in
 which JUSTICE BOATRIGHT, JUSTICE GABRIEL, JUSTICE SAMOUR, and
 JUSTICE BLANCO joined. CHIEF JUSTICE MÁRQUEZ, joined
 by JUSTICE HOOD dissented.

 Certified
 Question Answered

 OPINION

 BERKENKOTTER JUSTICE

 ¶1
 Seventy-two-year-old Mary Ann Moreno ("Moreno")
 sued her employer, Circle K Stores, Inc. ("Circle
 K"), for wrongful termination. She asserted that she was
 fired for lawfully exercising her right to self-defense after
 she was cornered by an armed robber during one of her shifts
 and that her termination violated Colorado public policy. We
 accepted jurisdiction under C.A.R. 21.1 to answer the
 following question of law certified to us by the United
 States District Court for the District of Colorado:

Does Colorado law recognize a public-policy exception to the
 at-will employment doctrine that allows an employee to bring
 a wrongful termination claim in the event the employee is
 terminated for actions taken in self-defense?

 ¶2
This court first recognized a public-policy exception to the
 at-will employment doctrine in Martin Marietta Corp. v.
 Lorenz, 823 P.2d 100, 109 (Colo. 1992). There, we
 identified a number of circumstances under which an at-will
 employee may bring a claim for wrongful discharge: if the
 employee was terminated for (1) refusing to engage in an
 illegal act, (2) performing a public duty, or (3) exercising
 an important job-related right or privilege. Id. To
 serve as the basis for such a claim, the right must be
 clearly expressed, sufficiently public, and granted to
 workers. Id.; Crawford Rehab. Servs., Inc. v.
 Weissman, 938 P.2d 540, 552 (Colo. 1997) (citing
Rocky Mountain Hosp. &Med. Serv. v. Mariani, 916
 P.2d 519, 525 (Colo. 1996)).

 ¶3
We have previously recognized, however, that
 "public-policy wrongful discharge is not subject to
 precise definition," Weissman, 938 P.2d at 552,
 and that the exception is rooted in the long-standing rule
 that "a contract violative of public policy should not
 be enforced," Martin Marietta, 823 P.2d at 108
(citing Russell v. Courier Printing &Publ'g
 Co., 95 P. 936, 938 (Colo. 1908)). Based on that
 long-standing rule, we have concluded that it is
 "axiomatic that a contractual condition, such as the
 terminability condition of an at-will employment contract,
 should also be deemed unenforceable when violative of public
 policy." Id. at 109.

 ¶4
This case requires us to decide if the right to self-defense,
 established either by section 18-1-704, C.R.S. (2025)
("section 704"), or by article II, section 3 of the
 Colorado Constitution ("article II, section 3"),
 meets the test we articulated in Martin Marietta. In
 answering the certified question, we first determine that
 both the statute and the constitutional provision clearly
 express the boundaries and extent of the right to
 self-defense based on their explicit language and the
 extensive and well-defined body of case law regarding
 self-defense. Next, we decide that the right to self-defense
 is inherently a public right, rather than an individual
 proprietary right, because it is an essential, inalienable
 right guaranteed to all people. Finally, we conclude that the
 right to self-defense, as expressed by both the statute and
 the constitutional provision, is a right that is job-related
 insofar as

 the need to exercise the right to defend oneself from an
 unprovoked attack can occur anywhere, including at work.

 ¶5
 While we conclude that this is a right granted to all people
 that is not left at the door simply because a person enters
 the workplace, we emphasize that the scope of the exception
 that we recognize today is narrow. It is limited,
 importantly, to self-defense as an essential, inalienable
 right. And, critically, the exception applies only when an
 employee lawfully exercises the right in response to an
 unprovoked attack at work.

 ¶6
 It is also important to understand what this case is not
 about. The certified question asks us only to answer if an
 exception exists. We are not called on to decide whether
 Circle K's policy bars its employees from acting in
 self-defense—as Moreno claims—or whether the
 policy simply prohibits employees from confronting
 shoplifters—as Circle K claims. We also need not decide
 if Moreno acted in self-defense or if Circle K fired Moreno
 for defending herself. We offer no opinion on any of those
 matters.

 ¶7
 Instead, we answer only the certified question. For the
 reasons detailed below, we answer the question in the
 affirmative and return this case to the district court for
 further proceedings.

 I.
Facts and Procedural History[1]

 ¶8
 Moreno was working at Circle K one evening when Tyler Wimmer
 approached the register holding several items, including two
 hunting knives. He placed the knives on the U-shaped counter
 that separated him from Moreno. After Wimmer told Moreno to
 get him a pack of cigarettes, Moreno asked what brand he
 wanted and retrieved them from the display case behind her.
When Moreno began to ring up the cigarettes, Wimmer said
 something to the effect of, "[J]ust give them to me for
 free." Moreno refused.

 ¶9
 Wimmer then picked up the knives and began to walk around the
 counter. Moreno twice told Wimmer, "[D]on't come
 back here." Undeterred, and with knives in hand, Wimmer
 continued to approach. When Moreno was within Wimmer's
 reach, Moreno extended her arms. In Moreno's telling, she
 instinctively did this to defend herself and to prevent
 Wimmer from coming closer to her.

Wimmer grabbed a pack of cigarettes, left the store, and was
 subsequently arrested for armed robbery.[2]

 ¶10
 Circle K terminated Moreno for violating its "Don't
 Chase or Confront" policy.[3] The policy instructs employees
 not to "confront[,] follow, pursue, track, chase,
 fight[,] or follow" any customer suspected of
 shoplifting. Moreno sued Circle K in state court, claiming,
 in pertinent part, that she was wrongfully discharged in
 violation of Colorado public policy because she was
 exercising her right to self-defense and trying to protect
 herself from being attacked.

 ¶11
 Circle K removed the case to the United States District Court
 for the District of Colorado and moved for summary judgment.
It argued that (1) Moreno was not acting in self-defense; (2)
 Circle K's decision to fire Moreno was based on an honest
 belief that she had not acted in self-defense; and (3)
 Colorado law does not recognize self-defense as a
 public-policy exception to the at-will employment doctrine.
Moreno countered that (1) she was acting in self-defense and
 (2) the

 court should recognize self-defense as a public-policy
 exception to the at-will employment doctrine.

 ¶12
The district court granted Circle K's summary judgment
 motion. It concluded that Colorado's statutory and
 constitutional right to self-defense does not give rise to a
 public-policy exception to the at-will employment doctrine.
These provisions, the court explained, do not set forth a
 sufficiently clear job-related right or privilege. In so
 ruling, the district court highlighted its cautious approach,
 noting that, as a federal court, it was "simply not in
 the position to recognize, in the first instance, a new type
 of public-policy exception to Colorado's at-will
 employment doctrine."

 ¶13
 Moreno appealed to the Tenth Circuit. It reversed the
 district court's order, concluding that factual
 issues—regarding (1) whether Moreno had used
 self-defense and (2) whether Circle K had fired her for doing
 so—remained unresolved and were potentially
 dispositive. The Tenth Circuit, accordingly, remanded the
 case to the district court for further factual findings.

 ¶14
 On remand, the district court found that genuine disputed
 issues of material fact existed as to both questions.
Specifically, the district court determined that questions
 regarding Moreno's credibility, interpretation of the
 surveillance video, and Circle K's motivation in
 terminating Moreno all presented genuine issues of

 material fact for a jury to decide. In light of these
 disputed issues of fact, the court denied the motion for
 summary judgment.

 ¶15
 Moreno then filed a motion to certify to this court the legal
 question of whether Colorado recognizes self-defense as a
 public-policy exception to the at-will employment doctrine.
The district court granted the motion, reasoning that the
 question (1) is likely determinative of the action, (2)
 presents a novel question of public policy requiring
 guidance, and (3) is an important issue. The district court
 noted that, because this case originated in state court, the
 question was well-suited for review by this court.

 ¶16
We accepted review of the certified question. Applying the
 factors we articulated in Martin Marietta, we now
 hold that the statutory and constitutional right to
 self-defense in Colorado is a clearly articulated right that
 belongs to all people, including employees.

 ¶17
We accordingly recognize a self-defense public-policy
 exception to the at-will employment doctrine.

 II.
Analysis

 ¶18
We begin by setting forth the applicable standard of review
 and the relevant case law. We then consider the language of
 section 704 and article II, section 3, each of which sets out
 the right to self-defense. Next, we answer the certified

 question, addressing in turn each prong of the test we
 established in Martin Marietta.

 ¶19
We hold that both section 704 and article II, section 3
 establish a public policy in favor of self-defense. First,
 both clearly express the extent of a person's right to
 act in reasonable self-defense when they have reasonable
 grounds to believe they are in imminent danger of death or
 great bodily injury, or of becoming the victim of certain
 other crimes. Second, because self-defense is an essential,
 inalienable right possessed by all Coloradans, it is a
 public, rather than a proprietary, right. Third, we conclude
 that the right to self-defense is a right guaranteed to all
 people, including people in the workplace. It is a
 job-related right insofar as the need to exercise the right
 to lawfully defend oneself from an unprovoked attack can
 occur in the workplace.

 ¶20
 Therefore, we conclude that applying the public-policy
 exception to this specific inalienable right is entirely
 consistent with the rationale underlying the exception to the
 at-will employment doctrine.

 A.
Jurisdiction

 ¶21
 Rule 21.1(a) grants us jurisdiction to resolve questions of
 law certified by a federal court. We exercise our
 jurisdiction when a question "may be determinative of
 the cause then pending in the certifying court and as to
 which it appears . . . that there is no controlling precedent
 in the decisions of the supreme court." Skillett v.
 Allstate Fire & Cas. Ins. Co.,

2022 CO 12, ¶ 8, 505 P.3d 664, 666 (quoting C.A.R.
 21.1(a)). We review such questions de novo. Id.
Similarly, we review de novo whether a constitutional,
 statutory, or other source provides a sufficiently clear
 expression of public policy. Jaynes v. Centura Health
 Corp., 148 P.3d 241, 244 (Colo.App. 2006) (citing
Mariani, 916 P.2d at 526).

 B.
The Public-Policy Exception to the At-Will Employment
 Doctrine

 ¶22
 The public-policy exception generally allows an at-will
 employee to pursue a claim for wrongful termination if their
 employer fires them for violating a clearly expressed public
 policy. Martin Marietta, 823 P.2d at 109. The
 exception constrains employers from terminating employees
 when the termination would have "a tendency to be
 injurious to the public or against the public good."
Id. at 105 (quoting Petermann v. Int'l Bhd.
 of Teamsters, Chauffeurs, Warehousemen &Helpers of Am.,
 Loc. 396, 344 P.2d 25, 27 (Cal. Dist. Ct. App. 1959)).
When a party claims a public-policy exception to the at-will
 employment doctrine, we consider if "the discharge of
 the employee contravenes a clear mandate of public
 policy." Mariani, 916 P.2d at 523-24 (quoting
Martin Marietta, 823 P.2d at 107). Although
 "public-policy wrongful discharge is not subject to
 precise definition," Weissman, 938 P.2d at 552,
 the essence of the exception is that an employee will have a
 cognizable claim for wrongful discharge if the discharge of
 the employee would

 be "detrimental to the public good," Martin
 Marietta, 823 P.2d at 108 (quoting Russell, 95
 P. at 938).

 ¶23
We set forth a four-part test in Martin Marietta to
 determine whether the termination of an at-will employee
 violates public policy. An at-will employee establishes that
 they were wrongfully discharged under the public-policy
 exception by showing:

(1) that the employer directed the employee to perform an
 illegal act as part of the employee's work related duties
 or prohibited the employee from performing a public duty or
 exercising an important job-related right or privilege;

(2) that the action directed by the employer would violate a
 specific statute relating to the public health, safety, or
 welfare, or would undermine a clearly expressed public policy
 relating to the employee's basic responsibility as a
 citizen or the employee's right or privilege as a worker;
 . . .

(3) that the employee was terminated as the result of
 refusing to perform the act directed by the employer[; and] .
 . .

(4) that the employer was aware, or reasonably should have
 been aware, that the employee's refusal to comply with
 the employer's order or directive was based on the
 employee's reasonable belief that the action ordered by
 the employer was illegal, contrary to clearly expressed
 statutory policy relating to the employee's duty as a
 citizen, or violative of the employee's legal right or
 privilege as a worker.

Id. at 109.

 ¶24
 Here, the first part of the test depends on the second part,
 while the third and fourth parts are questions of fact beyond
 the scope of the certified question.

 We thus
 focus on the second: whether self-defense is a clearly
 expressed right or privilege that an employee holds as a
 worker.

 ¶25
Colorado courts must be cautious in recognizing exceptions to
 the at-will employment doctrine. The power to create public
 policy sits squarely with the General Assembly, not the
 courts. Weissman, 938 P.2d at 553 ("The General
 Assembly is the branch of government charged with creating
 public policies, and the courts may only recognize and
 enforce such policies."). As such, we only recognize a
 public-policy exception to the at-will employment doctrine if
 the policy has been clearly expressed. Martin
 Marietta, 823 P.2d at 109. Importantly, that expression
 of public policy must also affect the public, not just an
 individual. Weissman, 938 P.2d at 552-53.

 ¶26
 Constitutional provisions, professional ethical codes, and
 administrative regulations may also serve as a basis for a
 public-policy exception. Mariani, 916 P.2d at
 524-25; Weissman, 938 P.2d at 553; Kearl v.
 Portage Env't, Inc., 205 P.3d 496, 499 (Colo.App.
2008) (deriving a public-policy exception from existing case
 law).

 ¶27
We have explained that to be "clearly expressed," a
 source of public policy must (1) provide a concrete, rather
 than hortatory or general, statement of policy; (2) provide
 employees with a clear mandate as to what constitutes
 appropriate conduct; and (3) provide employers sufficient
 notice of the policy. Mariani,

916 P.2d at 525-26; Lampe v. Presbyterian Med. Ctr.,
590 P.2d 513, 515 (Colo.App. 1978); see also Calvert v.
 Mayberry, 2019 CO 23, ¶ 26, 440 P.3d 424, 431
(holding that professional rules, which prohibit certain
 actions, provide a clear mandate).

 ¶28
 Because the General Assembly is typically the ultimate source
 of public policy, the clearest expressions of a particular
 policy occur when a statute (1) explicitly prohibits a
 behavior, see Martin Marietta, 823 P.2d at 108, 111;
(2) establishes a right, see Lathrop v. Entenmann's,
 Inc., 770 P.2d 1367, 1372 (Colo.App. 1989); or (3)
 creates a statutory scheme, id. Thus, if a statute
 prohibits certain acts in conjunction with other indicia of
 legislative intent, it may give rise to a public-policy
 exception to the at-will employment doctrine. See Jones
 v. Stevinson's Golden Ford, 36 P.3d 129, 133
(Colo.App. 2001) (concluding that a public-policy exception
 to the at-will employment doctrine exists based on
 "[t]he broad legislative purpose of the Colorado
 Consumer Protection Act").

 ¶29
 A statute or comparable provision, however, need not
 proscribe or prescribe specific actions to give rise to a
 public-policy exception. Provisions that encourage a
 particular beneficial behavior without establishing specific
 obligations related to employment may also be sufficient to
 create a public-policy exception. See Flores v. Am.
 Pharm. Servs., Inc., 994 P.2d 455, 459 (Colo.App. 1999)
("Also, while [section] 10-1-127(1.5)(a)[, C.R.S.
 (2025),] does not explicitly require employees or

 citizens to take an active part in ferreting out insurance
 fraud, the act encourages its exposure and detection.").

 ¶30
 To clearly express public policy, the statute or comparable
 provision must also implicate public safety, health, or
 welfare rather than an issue involving a primarily personal
 or proprietary interest of an individual. Weissman,
 938 P.2d at 552-53 (citing Gantt v. Sentry Ins., 824
 P.2d 680, 684 (Cal. 1992)). The right must touch upon a
 public health, safety, or welfare concern, or an
 employee's basic rights or duties. Id. at 553;
see also Mariani, 916 P.2d at 524. And the right
 must broadly implicate the public as a whole to outweigh the
 at-will employment doctrine. Weissman, 938 P.2d at
 553.

 ¶31
 Finally, for a plaintiff to claim that one of their rights or
 privileges was undermined, that right or privilege must be
 granted to them as a worker or be related to their job.
Martin Marietta, 823 P.2d at 109. Examples include:
 a privilege or right that is connected to conduct that occurs
 at work, like taking a lunch break; conduct arising from
 work, such as seeking compensation for a job-related injury;
 or obligations owed by the employer, such as proper
 compensation. Bonidy v. Vail Valley Ctr. for Aesthetic
 Dentistry, P.C., 186 P.3d 80, 84-85 (Colo.App. 2008);
Herrera v. San Luis Cent. R.R. Co., 997 P.2d 1238,
 1240 (Colo.App. 1999); Hoyt v. Target Stores, 981
 P.2d 188, 192 (Colo.App. 1998); see also Frampton v.
 Cent. Ind. Gas Co.,

297 N.E.2d 425, 428 (Ind. 1973) (holding that firing a worker
 for filing a workers' compensation claim violated public
 policy).

 ¶32
 Circle K acknowledges that the right to self-defense is a
 Colorado public policy but asserts that it is not clearly
 expressed by either section 704 or article II, section 3; is
 not a right that affects the public; and does not relate to
 employment. We briefly describe each provision, then discuss
 these issues.

 C.
Section 704

 ¶33
 The General Assembly has statutorily recognized the right to
 self-defense since the days of the Colorado territory. An
 Act Concerning Criminal Jurisprudence: Division IV, Offenses
 Against the Persons of Individuals, Secs. 28, 30, 1861
 Colo. Territorial Sess. Laws 290, 294 ("1861
 Self-Defense Law") (establishing "[j]ustifiable
 homicide" as "the killing of a human being in
 necessary self-defense"). In its modern form, a person
 may justifiably use force against another to defend
 themselves "from what he reasonably believes to be the
 use or imminent use of unlawful physical force by that other
 person, and he may use a degree of force which he reasonably
 believes to be necessary for that purpose." §
 18-1-704(1).

 ¶34
 Self-defense, like other legal justifications, is an
 affirmative defense. § 18-1-710, C.R.S. (2025). This
 court has repeatedly characterized section 704 as expressing
 a right to self-defense. See, e.g., Castillo v.
 People, 2018 CO 62, ¶ 58, 421 P.3d 1141, 1150;

People v. Toler, 9 P.3d 341, 352 (Colo. 2000);
Beckett v. People, 800 P.2d 74, 77-78 (Colo. 1990);
see also Galvan v. People, 2020 CO 82, ¶ 57,
 476 P.3d 746, 759 (Marquez, J., dissenting).

 ¶35
The statute specifically limits the right to self-defense.
First, a person must reasonably believe that they will
 imminently be subject to unlawful physical force. §
 18-1-704(1). Second, the use of force must be reasonably
 necessary. Id. Third, deadly force is only
 permissible under certain circumstances. § 18-1-704(2).
Finally, subject to limited exceptions, self-defense is
 unjustified if the person asserting the defense was the
 initial aggressor or if the use of force is based on the
 victim's gender identity or sexual orientation. §
 18-1-704(3).

 D.
Article II, Section 3

 ¶36
 Article II, section 3 sets out "natural, essential[,]
 and inalienable" rights. Colo. Const. art. II, § 3;
see also Colo. Anti-Discrimination Comm'n v.
 Case, 380 P.2d 34, 39-40 (Colo. 1962). These rights
 include "the right of enjoying and defending
[one's life]." Colo. Const. art. II, § 3
(emphasis added).

 ¶37
 Constitutional rights are not absolute and are subject to
 reasonable limitations. See, e.g.,
 People v. Brown, 485 P.2d 500, 503 (Colo. 1971)
("[T]his case clearly and explicitly recognizes that
 limitations may be placed upon an inalienable or inherent
 right ...."). They are also defined, interpreted, and
 bound by the jurisprudence of this court. See In re
 Legis. Reapportionment, 374 P.2d 66, 68

(Colo. 1962) ("The judicial branch of the government has
 imposed upon it the obligation of interpreting the
 [c]onstitution and of safeguarding the basic rights granted
 thereby to the people." (quoting Asbury Park Press,
 Inc. v. Woolley, 161 A.2d 705, 710 (N.J. 1960))).

 ¶38
 With both the statutory and constitutional text in mind, we
 now consider whether either provision is sufficient to
 establish self-defense as a public-policy exception to the
 at-will employment doctrine.

 E.
Section 704 and Article II, Section 3 Evince Public Policy
 Favoring Self-Defense that Encompasses Self-Defense by
 Employees

 1.
Section 704 and Article II, Section 3 Clearly Express Public
 Policy in Favor of the Right to Self-Defense

 ¶39
 First, we consider if section 704 and article II, section 3
 clearly express a public policy in favor of the right to
 self-defense. Section 704 sets out by whom, when, and how the
 right to self-defense may be exercised. §
 18-1-704(1)-(4). Any person, including any employee, may
 justifiably use force when they reasonably believe they face
 the "use or imminent use of unlawful physical force by
 [another] person." § 18-1-704(1). They may not use
 excessive force. § 18-1-704(2)-(3). And with limited
 exceptions, they are not justified in using force if they
 were the initial aggressor. § 18-1-704(3)(b). In short,
 the statute mandates how a person may defend themselves.
Thus, an employee would know that they could use force to
 defend themself, but that using force to confront a
 shoplifter, for example, would

 be unlawful. An employer would similarly be on notice about
 the lawful exercise of this right.

 ¶40
 Additionally, a statute setting out a criminal right or
 defense is as much an expression of the General
 Assembly's intent as a statute setting out criminal or
 civil liability and is no less a source of public policy. As
 we observed in Martin Marietta, an employee should
 not have to "choose between losing their job[] or
 engaging in criminal conduct." 823 P.2d at 111. So too
 with the right to self-defense: An employee should never have
 to choose between their job and their safety. Thus, section
 704 is strong evidence of Colorado's public policy in
 favor of self-defense.

 ¶41
 Article II, section 3 similarly provides a clear mandate. It
 concisely and unambiguously recognizes that "[a]ll
 persons have . . . the right of enjoying and defending their
 lives." Colo. Const. art. II, § 3. Despite its
 brevity, it provides a common understanding of when it's
 appropriate to exercise the right of self-defense. Our
 jurisprudence lays out the boundaries of the constitutional
 right to self-defense, as we discussed in Part II.C.

 ¶42
 The constitutional right to self-defense is further
 understood through its evolution alongside Colorado's
 statutory right to self-defense. The territorial statute,
 first enacted in 1861, predates the constitutional right,
 which was ratified in 1876, nearly a decade and a half later.
See 1861 Self-Defense Law. The judicial

 understanding of the inalienable right to self-defense
 identified in article II, section 3 developed alongside
 Colorado's self-defense statute. See,
 e.g., Idrogo v. People, 818 P.2d 752, 754
(Colo. 1991) (describing the evolution of §
 18-1-704(2)); § 18-1-704. Because the statute codifies
 elements of the common law, its evolution provides guidance
 as to the extent of the constitutional right. People ex
 rel. Graves v. Dist. Ct., 86 P. 87, 89 (Colo. 1906)
("The [c]onstitution of a state is not the beginning of
 the law for a state. Under our system of jurisprudence it
 assumes the existence of the common law from which we must
 draw in interpreting its provisions."). Accordingly, the
 expression of the right to self-defense set out in the
 Colorado Constitution draws on the expression of the right
 set out by statute.

 ¶43
 The combination of precedent and statutory language clearly
 defines the permissible boundaries of the constitutional
 right to self-defense in Colorado. Thus, though the language
 of article II, section 3 extends broadly—as it must to
 protect the inalienable rights of Coloradans—it is not
 a purely hortatory provision. See Mariani, 916 P.2d
 at 525. It identifies a "clear mandate,"
id. at 526, bound by our case law, giving notice to
 employees and employers as to what conduct is permissible and
 what is not. Accordingly, we conclude that it too presents a
 clear public policy in favor of self-defense.

 2.
Self-Defense Impacts the Public and Is a Public
 Right

 ¶44
 Next, we consider whether the right to self-defense is a
 public right. We first explained the distinction between
 public rights and rights that do not "truly impact[] the
 public" in Weissman. 938 P.2d at 552. There, a
 typist claimed that she was wrongfully discharged for taking
 rest breaks she had a right to take pursuant to Colorado
 Minimum Wage Order No. 19, Dep't of Lab. &Emp., 7
 Colo. Code Regs. 1103-3 (1983). Weissman, 938 P.2d
 at 552-53. We held that the rights she relied on were not
 significant enough to implicate a "fundamental,
 substantial public policy." Id.[4]

 ¶45
 Here, by contrast, the right to self-defense is an essential,
 inalienable right expressed in this state's
 constitution—one that has been statutorily recognized
 for longer than Colorado has been a state. See 1861
 Self-Defense Law. Though this essential, inalienable right is
 possessed and exercised by individuals, its impact is
 necessarily public. See Semore v. Pool, 266
 Cal.Rptr. 280, 285 (Cal.Ct.App. 1990) ("While rights are
 won and lost by the individual actions of people, the
 assertion

 of the right establishes it and benefits all [people]
 ...."). Furthermore, consideration of a right's
 public impact should not be examined through too narrow a
 lens. Otherwise, this element would swallow the entire
 public-policy exception, as any right guaranteed to the
 public could also be characterized as an individual matter.
For instance, the right to file for workers' compensation
 could be cast as the right of an individual worker, not the
 general public; the right to be paid for work is the right of
 the individual worker who performed the work, not the general
 public; and the right to take lunch breaks is the right of an
 individual worker, not the general public. Yet all these
 rights have given rise to public-policy exceptions.

 ¶46
Cases from other jurisdictions have similarly concluded that
 self-defense is a public right. See, e.g., State
 v. Merk, 164 P. 655, 657 (Mont. 1917) ("[T]he
 possession and exercise of the right of self-defense by the
 individual are still deemed to be necessary to personal
 safety and security and not incompatible with the public
 good."). As the Utah Supreme Court noted in a case
 similar to this one, "A policy favoring the right of
 self-defense preserves and protects human life .... [Such a
 policy] protects individuals from serious injuries and deters
 the completion of crime." Ray v. Wal-Mart Stores,
 Inc., 359 P.3d 614, 627 (Utah 2015) (footnotes omitted).
Similarly, the West Virgina Supreme Court has recognized that
 the right to self-defense affects the safety of the public.
Feliciano v. 7-Eleven, Inc.,

559 S.E.2d 713, 750 (W.Va. 2001). These cases support our
 conclusion that section 704 and article II, section 3 both
 set forth a sufficiently public right affecting the safety of
 the broader public.

 ¶47
 Circle K relies on Hoven v. Walgreen Co., 751 F.3d
 778 (6th Cir. 2014), to advance its position that
 self-defense is not a public right. There, the Sixth Circuit
 considered a pharmacist's claim that he was terminated
 for exercising his right to self-defense. Id. at
 784. The court analyzed multiple potential sources of public
 policy: the United States and Michigan Constitutions,
 Michigan's self-defense and concealed-carry statutes, and
 a jury instruction. Id. at 785-86. It concluded that
 these sources were insufficient under Michigan law to create
 an exception to at-will employment because only statutes that
 directly "confer[red] a right on the public" could
 support a claim of termination in violation of public policy.
Id.

 ¶48
 Analogizing to Hoven, Circle K argues that section
 704 creates only an individually applicable exemption from
 liability. This reliance is misplaced. Notably, the statute
 interpreted in Hoven provides that

it is a rebuttable presumption in a civil or
 criminal case that an individual who uses deadly force or
 force other than deadly force under section 2 of the
 self-defense act has an honest and reasonable belief that
 imminent death of, sexual assault of, or great bodily harm to
 himself or herself or another individual will occur ....

Mich. Comp. Laws Ann. § 780.951(1) (West 2026) (emphasis
 added) (footnote omitted).

 ¶49
The holding in Hoven is inapplicable here, however,
 given the limited extent of the Michigan statute and
 Michigan's prohibition on using constitutional provisions
 as a source of public policy. 751 F.3d at 784-85 ("The
 right, if any, that is conferred is simply the right to
 present a defense in a criminal case."). Even if our
 court's repeated references to the "right of
 self-defense," see Part II.C, supra,
 were set aside, the plain language of section 704 sets out a
 legal justification for the use of force, not simply
 a right to present a defense, see §
 18-1-704(1). In sum, the statutory and constitutional right
 to self-defense is a generally applicable public right.

 3. The
 Public-Policy Exception Protects Employees from Being Forced
 to Choose Between Their Safety and Their Employment

 ¶50
 Finally, we consider whether an employer's firing of an
 at-will employee for exercising their right to self-defense
 constitutes termination based on the employee's exercise
 of a job-related right. In Martin Marietta, we
 explained that one of the elements to consider in determining
 if the termination of an at-will employee violates public
 policy is whether the action directed by the employer would
 undermine a clearly expressed public policy relating to the
 employee's right or privilege as a worker. 823 P.2d at
 109. Historically, the rights and privileges that Colorado
 courts have found to fit this description largely concerned
 worker conditions and compensation. See Bonidy, 186
 P.3d at 85. Courts have

 deemed these rights and privileges to be job-related insofar
 as they occur at work or arise from work. Id.

 ¶51
 But a provision need not specifically regulate or even
 mention employment to give rise to an employee's rights
 or privileges as a worker. See Martin Marietta, 823
 P.2d at 110-11 (concluding that 18 U.S.C. § 1001, which
 broadly prohibits making false representations to the federal
 government, was related to a plaintiff's job). As we have
 recognized, "public-policy wrongful discharge is not
 subject to precise definition." Weissman, 938
 P.2d at 552. The exception itself is rooted in a broader
 principle: the long-standing rule that "a contract
 violative of public policy should not be enforced."
Martin Marietta, 823 P.2d at 108 (citing
Russell, 95 P. at 938). Based on that fundamental
 concept, we have recognized that the essence of the exception
 is that an employee will have a cognizable claim for wrongful
 discharge if their discharge would be "detrimental to
 the public good." Id. (quoting
Russell, 95 P. at 938).

 ¶52
 To be sure, at-will employment gives employers broad
 discretion over the terms of employment. It does not,
 however, allow employers to require employees to commit
 illegal acts. Id. at 108, 113. Nor does it allow
 employers to prevent employees from reporting legal
 violations or from performing legal duties, Mariani,
 916 P.2d at 526, or from exercising important job-related
 rights, Lathrop, 770 P.2d at 1375. One broad,
 unifying principle in cases analyzing the

 public-policy exception—here and across the
 country—is that an employer may not use termination to
 penalize an employee for exercising a constitutional or
 statutory right that reflects an important, clearly expressed
 public policy that affects the public. See id.;
Bonidy, 186 P.3d at 84-85; Herrera, 997
 P.2d at 1240; see also Frampton, 297 N.E.2d at 427
(holding that a worker was wrongfully terminated for filing a
 workers' compensation claim authorized by Indiana
 statute). Applying these principles here, we conclude that an
 employer may not lawfully terminate an employee for properly
 exercising their essential, inalienable right to self-defense
 if the employee suffers an unprovoked attack at work.

 ¶53
 The employment relationship should not be used to strip
 workers of the ordinary legal privileges every
 person possesses. The right to self-defense has never been
 cabined by role or location. See Colo. Const. art.
 II, § 3. It is a unique, essential, and inalienable
 right that exists for workers, students, retirees, and the
 unemployed alike. It allows people to protect themselves in
 their homes, schools, houses of worship, and workplaces under
 very specifically defined circumstances. Here, it is the very
 breadth of the right—of the policy—that informs
 the analysis. It makes no sense to suggest that everyone has
 an inalienable right to defend themselves if faced with
 imminent danger, unless they are at work. Rather, the right
 follows the employee from home to work and back and
 everywhere in between.

 ¶54
 Put another way, the right to self-defense is job-related
 insofar as the need to lawfully defend oneself from an
 unprovoked attack can occur at work. Thus, even though the
 right to self-defense—constitutional and
 statutory—does not explicitly mention workers, it is
 nonetheless a right guaranteed to workers within the meaning
 of Martin Marietta. Under the law, it is an
 essential, inalienable right guaranteed to everyone,
 including people at work. It is not a right that is left at
 the door when a person enters the workplace.

 ¶55
 A central question in the public-policy-exception analysis is
 whether an employee is "put to the choice of either
 obeying an employer's order [in contravention of public
 policy] or losing his or her job." Martin
 Marietta, 823 P.2d at 109. The exception aims to prevent
 an employer from leveraging the threat of retaliatory
 discharge to compel employees into either illegal conduct or
 into giving up their rights or privileges. See id.
 at 110; see also Frampton, 297 N.E.2d at 427-28
(analogizing wrongful termination in violation of public
 policy to retaliatory eviction).

 ¶56
 Self-defense is certainly no less important a right to a
 worker than workers' compensation, which is not a
 "right" at all but which our court of appeals and
 other jurisdictions have recognized as giving rise to a
 public-policy exception to the at-will employment doctrine.
Just as permitting employers to discharge employees for
 filing workers' compensation claims would undermine the

 workers' compensation system, so too would permitting
 discharge on the basis of self-defense undermine the right to
 self-defense. The choice between a loss of income —a
 rippling instability that in some cases may upend a
 person's entire life—or enduring a physical attack
 is exactly the choice of evils the public-policy exception
 was meant to prevent. Plus, it is illogical to conclude that
 an employee may not be fired for seeking workers'
 compensation benefits if physically attacked and injured at
 work, but the same employee may be fired for defending
 themselves from being punched, stabbed, or sexually
 assaulted. Notably, however, this does not mean that an
 employer may not place reasonable limitations on these
 broader, societal rights to maintain the efficiency, safety,
 and stability of a workplace.

 4.
Colorado Recognizes Constitutional Provisions as a Source of
 Public-Policy Exceptions to At-Will Employment

 ¶57
 Finally, we address Circle K's argument that article II,
 section 3 cannot be a source of a public-policy exception
 because the section only protects against
 governmental, rather than private, actions. We
 disagree.

 ¶58
 Circle K's logic suggests that no provision in
 Colorado's bill of rights, or perhaps in the whole
 constitution, can ever give rise to a public-policy exception
 to at-will employment. True, constitutions are, by
 definition, restraints on governmental, rather than private,
 power. People v. Rodriguez, 112 P.3d 693, 695

(Colo. 2005) ("Colorado's Constitution . . .
 'does not comprise a grant of but rather, a limitation on
 power.'" (quoting Reale v. Bd of Real Est
 Appraisers, 880 P.2d 1205, 1208 (Colo 1994))); People ex
 rel Elder v Sours, 74 P 167, 186 (Colo 1903) ("The
 [c]onstitution of a state is an instrument of restraints or
 limitations on legislative power"); see also United
 States v Nicholls, 4 Yeates 251, 260 (Pa 1805)
(Brackenridge, J, concurring); Baker v. City of
 Fairbanks, 471 P.2d 386, 394 (Alaska 1970). But this
 conclusion—i.e., limiting sources of public policy in
 this specific context to only those that restrain private,
 rather than public, action—would effectively abrogate
 long-established precedent. See Mariani, 916 P.2d at
 524 (identifying sources of public policy including
 constitutional provisions, ethical codes, statutes, and
 administrative regulations).

 ¶59
We also decline to follow the analysis in Slaughter v.
 John Elway Dodge Southwest/AutoNation, 107 P.3d 1165,
 1170 (Colo.App. 2005), where a division of the court of
 appeals noted that the plain text of article II, section 3
 does not clearly express a right to refuse drug
 testing—or indeed even a right to privacy. The question
 in Slaughter is a far cry from the question here,
 particularly given that the plain text of article II, section
 3 explicitly grants "the right of enjoying and defending
 [one's life]." Colo. Const. art. II, § 3. And
 while Slaughter holds that the Fourth Amendment
 binds only governmental actors, it draws no analogy between
 the Fourth Amendment and article II, section 3. 107 P.3d at
 1169-70.

 ¶60
 As we have already observed, the Sixth Circuit's decision
 in Hoven does not change our analysis. Michigan law
 does not recognize any constitutional provision as
 the source of a public-policy exception to the at-will
 employment doctrine. Hoven, 751 F.3d at 784
("[U]nder Michigan law, constitutional provisions may
 not be the source of a claim for termination in violation of
 public policy against a private employer."). Because
 Colorado law recognizes that constitutional provisions may
 serve as the basis of public-policy exceptions to the at-will
 employment doctrine, the Sixth Circuit's analysis is
 inapplicable here.

 III.
Conclusion

 ¶61
 For these reasons, we answer the certified question by
 concluding that yes, both section 704 and article II, section
 3 can serve as the basis for a claim of wrongful termination
 contrary to public policy.[5] To hold otherwise would fatally
 undermine that right.

 CHIEF
 JUSTICE MARQUEZ, joined by JUSTICE HOOD, dissenting.

 ¶62
 Today the majority establishes a new public-policy exception
 to the at-will employment doctrine grounded in the right to
 self-defense found in article II, section 3 of the Colorado
 Constitution and the justification of self-defense found in
 Colorado's Criminal Code in section 18-1-704, C.R.S.
 (2025). In doing so, the majority misapplies (and effectively
 rewrites) our test for public-policy exceptions established
 in Martin Marietta Corp. v. Lorenz, 823 P.2d 100,
 109 (Colo. 1992).

 ¶63
 First, by answering the certified question in the abstract,
 the majority's analysis is largely divorced from the
 underlying facts of this case. The majority's holding
 appears to be grounded in its concern that no person should
 be forced to choose between their job and their personal
 safety. Maj. op. ¶ 40. Yet Circle K Stores, Inc.'s
 "Don't Chase or Confront Policy" demands no
 such choice. Because the majority answers the legal question
 without wrestling with important underlying facts, including
 the purpose and narrow scope of the employer policy at issue
 here, the majority's opinion makes broad pronouncements
 with implications for the at-will employment doctrine that
 reach well beyond this case.

 ¶64
 The majority reasons that any individual constitutional right
 is a "public" right merely because it is an
 "essential, inalienable right" held by all
 individuals. Id. at ¶¶ 4, 45. Moreover, it
 concludes that a constitutional right held by all

 individuals meets the job-related requirement of our
 Martin Marietta test simply because a right
 guaranteed to "everyone" includes "people at
 work." Id. at ¶ 54.

 ¶65
 Taken together, the majority's reasoning has startling
 implications. Although the majority acknowledges that rights
 conferred by the constitution constrain only state
 action, id. at ¶ 58, its reasoning means that
 after today, a private employer may not lawfully
 terminate an at-will employee for conduct related to the
 exercise of any inalienable constitutional right—even
 if the employee's conduct plainly violates the
 employer's policies.

 ¶66
 I not only disagree with the majority's reasoning that a
 constitutional provision can be the source of a claim for
 termination in violation of public policy against a
 private employer, but I also fear that the practical
 implications of today's ruling will tie employers'
 hands and ultimately undermine workplace safety. Accordingly,
 I respectfully dissent.

 I.
Summary of the Facts

 ¶67
 Although we have been asked to address an issue of law, the
 factual context giving rise to the certified question here
 remains important. See In re Phillips, 139 P.3d 639,
 647 (Colo. 2006) (Eid, J., dissenting) (emphasizing that a
 full picture of the facts can be important context, even when
 answering a certified question, because "[f]acts enable
 the [c]ourt to consider how the doctrine works in context,
 rather than in isolation"). On its face, Circle K's
 "Don't Chase or Confront Policy"

 does not prohibit an employee from acting in
 self-defense in response to an assault or the imminent use of
 unlawful physical force against that employee. Rather, as its
 title makes clear, the policy prohibits employees from
 actively pursuing or confronting suspected shoplifters.
Specifically, the policy instructs employees not to
 "confront[,] follow, pursue, track, chase, [or]
 fight" persons suspected of theft, but instead to
 "maintain[] a safe position behind the sales
 counter" or "go to a safer area in the back of the
 store":

CONFRONT & CHASE POLICY

We want you to always have a safe and enjoyable working
 experience with Circle K and especially during any special
 events and holiday weekends.

So please remember the

"Don't Chase or Confront Policy"

Do not confront follow, pursue, track, chase, fight or follow
 [inside and/or outside] any person[s] suspected of
 shoplifting products and/or cash from the site, beer runs or
 any other confrontational situation.

If you observe theft at the site, wait until the person(s)
 leave the site and call the police immediately. Remember to
 try to obtain as much information about the person(s) as
 possible while maintaining a safe position behind the sales
 counter. Do not go outside after the person(s), if there is
 any reason you need to go outside for you are to wait at
 least 5 minutes and have called the police department and
 verbally spoke to the Store Manager or Market Manager.

At no time do you come from behind the counter, go to or out
 the doors to attempt to get additional information. If you
 can safely obtain information from where you are standing
 that will be sufficient. Stay where you are or go to a safer
 area in the back of the store. Do not approach the front
 doors or go out them. Call 9-1-1 immediately.

At no time do you stop, question or accuse a person(s) of
 theft.

At no time do you get into a verbal altercation with any
 customer and/or person(s) you suspect of theft. At no time
 are you to go outside after dark! Sun down to sun up!

This policy Is for your protection and for the
 safety of everyone i

If you have any questions or issues, please refer to the
 5-Minute Rule of communication or your MM. Never talk to the
 media or answer any questions on the immediate situation or
 any others.

FAILURE TO FOLLOW THE "DON'T CHASE or CONFRONT
 POLICY" WILL RESULT IN IMMEDIATE TERMINATION Q

 ¶68
 In sum, the policy aims to prevent employees from provoking
 encounters or escalating situations with would-be thieves
 that might increase the risk of harm to both employees and
 customers. As Circle K points out, the Occupational Safety
 and Health Administration ("OSHA") specifically
 recommends that employers maintain de-escalation policies
 such as this to guard against workplace violence. OSHA,
 OSHA FactSheet: Workplace Violence (2024),
 https://www.osha.gov/sites/
 default/files/publications/FACTSHEET-WORKPLACE-VIOLENCE.pdf
 [https://perma.cc/44SZ-XK3D]. Nothing about Circle K's
 policy suggests that an employee would be "fired for
 defending themselves from being punched, stabbed, or sexually
 assaulted." Maj. op. ¶ 56.

 ¶69
 Although the majority sets forth Mary Ann Moreno's
 version of events, id. at ¶¶ 8-9, Circle K
 views the surveillance video of the incident differently.
Circle K contends it did not terminate Moreno for acting in
 self-defense but rather, because she violated the
 "Don't Chase or Confront Policy" by
 unnecessarily confronting Tyler Wimmer, the shoplifter, to
 try to prevent him from stealing cigarettes.

 ¶70
 According to Circle K, as Wimmer walked toward the cigarette
 display case, Moreno did not move out of the way, but stood
 her ground, and in violation of the policy, confronted
 Wimmer, saying, "Don't come back here." As
 Wimmer came around the counter to take the cigarettes, he
 moved a knife he was carrying into

 his right hand, away from Moreno. At that point, Moreno took
 a step toward Wimmer and positioned herself between
 him and the cigarettes, while extending her left arm toward
 him. Wimmer turned his back to Moreno to reach past her with
 his left hand to get to the cigarettes. Moreno then grabbed
 Wimmer by the back of the shirt and pulled on his left sleeve
 and left elbow, trying to pull him away from the cigarettes
 and telling him she would call the cops. Wimmer was quickly
 able to grab the cigarettes and pull free of Moreno before
 walking away from her and leaving the store.

 ¶71
 In Circle K's view, Moreno had the opportunity to
 cooperate and limit the possibility of violence. Instead, in
 violation of the "Don't Chase or Confront
 Policy," Moreno chose to verbally confront and
 physically engage Wimmer, elevating the risk of harm to
 herself and others.

 ¶72
 These disputed facts will ultimately have to be resolved by a
 jury, but I note them because they reveal important context
 overlooked by the majority when answering the certified
 question in the abstract. It is possible that a jury could
 find that Moreno was not acting in self-defense during her
 encounter with Wimmer. And yet, the majority's decision
 today broadly nullifies policies like Circle K's by
 preventing employers from terminating employees who choose to
 confront would-be shoplifters—arguably even when doing
 so only to defend property and

 not themselves. I fear that employers' inability to
 enforce such de-escalation policies will undermine workplace
 safety.

 II.
Analysis

 ¶73
 In general, employment contracts in Colorado are at-will,
 meaning that either the employer or the employee may
 terminate the relationship at any time. Cont'l Air
 Lines, Inc. v. Keenan, 731 P.2d 708, 711 (Colo. 1987).
In Martin Marietta, we recognized an exception to
 this general rule in situations where an employer terminates
 an employment contract in violation of public policy. 823
 P.2d at 109. Under the public-policy exception to the at-will
 employment doctrine, an employee has a cognizable claim for
 wrongful discharge if the discharge contravenes a "clear
 mandate of public policy." Id. at 107 (quoting
Thompson v. St. Regis Paper Co., 685 P.2d 1081, 1089
(Wash. 1984)).

 ¶74
We have traditionally taken a cautious approach to announcing
 publicpolicy exceptions to at-will employment because
 "expansive definition[s] of public policy would be both
 unwieldy and unpredictable leaving employers and employees
 alike without direction as to the contours of the public
 policy exception." Rocky Mountain Hosp. &Med.
 Serv. v. Mariani, 916 P.2d 519, 524 (Colo. 1996). We
 have emphasized that "[w]e must develop the common law
 in this area with care." Crawford Rehab. Servs.,
 Inc. v. Weissman, 938 P.2d 540, 553 (Colo. 1997).

 Accordingly,
 we require parties seeking a public-policy exception to meet
 four requirements. Martin Marietta, 823 P.2d at 109;
Mariani, 916 P.2d at 527.

 ¶75
 Specifically, an at-will employee has a prima facie case for
 wrongful discharge under the public-policy exception if the
 employee presents evidence that the employer's action
 interfered with or undermined the employee's
 job-related right or privilege as a worker by
 establishing the following four elements:

(1) the employer directed the employee to perform an illegal
 act as part of the employee's work related
 duties or prohibited the employee from performing a
 public duty or exercising an important job-related right
 or privilege; . . .

(2) the action directed by the employer would violate a
 specific statute relating to the public health, safety, or
 welfare, or would undermine a clearly expressed public policy
 relating to the employee's basic responsibility as a
 citizen or the employee's right or privilege as a
 worker; . . .

(3) the employee was terminated as the result of refusing to
 perform the act directed by the employer[; and] . . .

(4) the employee present[s] evidence showing that the
 employer was aware, or reasonably should have been aware,
 that the employee's refusal to comply with the
 employer's order or directive was based on the
 employee's reasonable belief that the action ordered by
 the employer was illegal, contrary to clearly expressed
 statutory policy relating to the employee's duty as a
 citizen, or violative of the employee's legal right
 or privilege as a worker.

Martin Marietta, 823 P.2d at 109 (emphases added).

 ¶76
 Our test plainly focuses on the infringement of an
 employee's job-related right or privilege as a
 worker. Our case law applying the test confirms this.
Id. at

 111; Mariani, 916 P.2d at 526. Moreover, the public
 policy must be clearly expressed so it provides
 "employers and employees" sufficient
 notice of "the behavior it requires."
Mariani, 916 P.2d at 524-25; see also Calvert v.
 Mayberry, 2019 CO 23, ¶¶ 20-27, 440 P.3d 424,
 430-32 (requiring the public policy to offer a "clear
 mandate to act (or not act) in a certain way").

 ¶77
 In addition, the clearly expressed policy must "concern
 behavior that truly impacts the public,"
Mariani, 916 P.2d at 525, rather than an
 individual's "purely personal or proprietary
 interest," Weissman, 938 P.2d at 552. See
 also Maj. op. ¶ 30.

 ¶78
 In sum, to find a public-policy exception to at-will
 employment, our test requires a clearly expressed public
 policy that (1) relates to the employee's rights or
 privileges as a worker, and (2) truly impacts the public.

 ¶79
 The majority correctly recites the test and its factors,
 id. at ¶¶ 22-23, but then proceeds to
 misapply the test to this case, and in doing so, effectively
 rewrites part of it. Specifically, the majority holds that
 article II, section 3 of the Colorado Constitution and
section 18-1-704 clearly express a general right to
 self-defense that is sufficiently public and related to an
 employee's rights or privileges as a worker. Maj. op.
 ¶¶ 16-17, 44-56. I disagree.

 A.
 Colorado's Right to Self-Defense Is Not Related to an
 Employee's Rights or Privileges as a Worker

 ¶80
 Even assuming for the sake of argument that article II,
 section 3 of the Colorado Constitution and section 18-1-704
"clearly express" a right to self-Q

 defense, neither provision relates to an employee's
 rights or privileges as a worker. Article II, section 3
 provides that "[a]ll persons have certain natural,
 essential and inalienable rights, among which may be reckoned
 the right of enjoying and defending their lives and
 liberties; of acquiring, possessing and protecting property;
 and of seeking and obtaining their safety and
 happiness." These broad, general rights, which have been
 part of our constitution since statehood, have no specific
 connection to employment. Like other individual
 constitutional rights, these rights reflect limitations on
 government power, not restrictions on private
 employers. City of Longmont v. Colo. Oil &Gas
 Ass'n, 2016 CO 29, ¶ 58, 369 P.3d 573, 585-86
("[Article II, section 3] protects fundamental rights
 from abridgment by the state absent a compelling government
 interest.").

 ¶81
 In turn, section 18-1-704 codifies the right to defend
 one's life against government intrusion by prohibiting
 the state from holding a person criminally liable for acting
 in self-defense.[1] Similarly, section 18-1-706, C.R.S.
 (2025), creates a defense to criminal liability for using
 force in defense of property "to prevent what [an
 individual] reasonably believes to be an attempt by the other
 person to commit theft, criminal mischief, or criminal
 tampering involving property." And

section 18-1-704.5(4), C.R.S. (2025), shields
 "occupant[s] of a dwelling" from civil liability
 for acting in self-defense under certain circumstances.

 ¶82
 Our previous cases finding public-policy exceptions to
 at-will employment concerned clearly expressed public
 policies directly related to rights or privileges associated
 with the employee's work. In Martin Marietta,
 the employee "had a duty as principal investigator of
 several NASA projects" to report and control
 deficiencies, and the employer's insistence that the
 employee contravene this duty was directly related to the
 employee's job duties. 823 P.2d at 111. The same was true
 in Mariani. There, the employer allegedly pressured
 the employee to violate a professional ethics rule requiring
 the employee to "report financial information fairly and
 accurately"—a duty directly connected to the
 employee's work as an accountant. Mariani, 916
 P.2d at 526.

 ¶83
 Here, the right to be free from criminal liability for acting
 in self-defense has no inherent connection to work, and the
 majority's attempt to argue that it does has dangerously
 broad implications.

 ¶84
 Per the majority, the right to self-defense is job-related
 because the need to defend oneself "can occur at
 work." Maj. op. ¶ 54. The majority reasons that the
 right "has never been cabined by role or location"
 and "allows people to protect themselves in their homes,
 schools, houses of worship, and workplaces."
Id. at 1 n

¶ 53. Therefore, the majority argues, the right is
 necessarily job-related. Id. at ¶¶ 53-54.

 ¶85
 I agree that the right to be free from criminal liability for
 actions taken in self-defense does apply to everyone,
 everywhere in Colorado. But a constraint on governmental
 prosecutorial power does not make the right to self-defense
 job-related, nor does it somehow impose constraints
 on employers in the context of an at-will employment
 relationship. The majority argues that it would be illogical
 to allow a public-policy exception for seeking workers'
 compensation benefits but not to allow one for acting in
 self-defense at work. Id. at ¶ 56. Yet
 workers' compensation benefits are inherently connected
 to work and are directly job-related. Indeed, such benefits
 arise only in the context of employment.

 ¶86
 Nothing about a general right applicable to everyone
 everywhere renders that right inherently job-related. In
 concluding otherwise, the majority misapplies our test and
 our precedent.

 B.
Article II, Section 3 of the Colorado Constitution and
Section 18-1-704 Do Not Establish a "Public"
 Right

 ¶87
 Contrary to the majority's insistence, an individual
 right is not a "public" right simply because the
 constitution labels it "inalienable." Id.
at ¶ 45. Our previous cases on public-policy exceptions
 to at-will employment have emphasized that "public"
 rights are those that "affect[] society at large"
 and "truly

 impact[] the public." Weissman, 938 P.2d at
 552. Rights that affect only "purely personal"
 interests cannot justify a public-policy exception.
Id.

 ¶88
We have recognized public-policy exceptions where employers
 have allegedly pressured employees to violate the law and
 thereby endanger the public. As mentioned above, in
 Martin Marietta, a government contractor allegedly
 asked an employee to commit fraud on NASA in direct violation
 of a federal statute. 823 P.2d at 102-04, 110-11. The public
 impact was plain because lying to government agencies like
 NASA could endanger the public and cost taxpayer dollars.
Similarly, in Mariani, a health insurance company
 allegedly fired one of its accountants for refusing to make
 knowing misrepresentations in violation of professional
 ethics rules. 916 P.2d at 521-23. There again, the public
 policy at issue was both clear and sufficiently public
 because the ethics rule "ensure[d] the accurate
 reporting of financial information to the public" and
 thereby "allow[ed] the public and the business community
 to rely . . . on financial reporting." Id. at
 526. In contrast, we rejected the employee's claim in
 Weissman that a public-policy exception existed
 based on the right to take a certain number of rest breaks
 from her job as a typist, reasoning that such rest breaks
 amounted to a personal interest and did not "truly
 impact[] the public." 938 P.2d at 552-53.

 ¶89
 Here, the right to self-defense is similarly personal in that
 it absolves an individual from criminal liability in certain
 circumstances for using force against 1 9

 another to defend themselves. This protection against
 criminal liability solely benefits the individual; it does
 not impact the public at large.

 ¶90
 The majority asserts that the right to self-defense in the
 Colorado Constitution is a public right because it is an
 "inalienable" right. Maj. op. ¶ 45. It insists
 that while an "inalienable right is possessed and
 exercised by individuals, its impact is necessarily
 public." Id. But it fails to explain how. An
 "inalienable" right is simply an inherent right
 that "cannot be transferred or surrendered."
Right, Black's Law Dictionary (12th ed. 2024).
That such rights are guaranteed to all individuals does not,
 ipso facto, make them "public" rights.
Again, our constitution preserves certain fundamental rights
 from infringement by the government, not private actors.

 ¶91
 According to the majority, examining whether a right is
 public "through too narrow a lens" would
 "swallow the entire public-policy exception"
 because any right can be "characterized as an individual
 matter." Maj. op. ¶ 45. But the majority
 has it backwards. It is the majority's new broad rule
 that not only rewrites our test but effectively swallows the
 public-policy exception entirely.

 ¶92
 If a right need only be held by everyone to qualify as a
 "public" right, then virtually all rights under the
 law, not just "inalienable" constitutional rights,
 would qualify. Perhaps the majority's reasoning rests on
 some other special quality of inalienable rights. But without
 further explanation, we are left to guess.

 ¶93
 Finally, although the majority states that "Colorado law
 recognizes that constitutional provisions may serve as the
 basis of public-policy exceptions," id. at
 ¶ 60, none of our cases have expressly held this,
 id. at ¶ 26 (first citing Mariani, 916
 P.2d at 524-25; then citing Weissman, 938 P.2d at
 553). In Mariani, we discussed other jurisdictions
 that rely on constitutional provisions, but we did not adopt
 any rule indicating that constitutional provisions may serve
 as sources of public-policy exceptions. 916 P.2d at 524-26.
In our other two cases on this subject, we never even
 discussed constitutional provisions. See Martin
 Marietta, 823 P.2d at 104-11; Weissman, 938
 P.2d at 551-53. I cannot agree that a right stemming from the
 constitution that limits state action necessarily constrains
 private employers to the degree that it may serve as
 an exception to our doctrine of at-will employment.

 C.
The Majority's Reasoning Raises Troubling Legal and
 Practical Questions

 ¶94
 Per the majority, section 18-1-704 and our case law
 collectively define the contours of the majority's newly
 recognized public-policy exception to at-will employment.
Maj. op. ¶¶ 35, 39. But despite the majority's
 insistence that its holding is narrow, id. at ¶
 5, it cannot escape the breadth of its reasoning, which gives
 rise to a number of troubling legal and practical questions.

 ¶95
 Does the public-policy exception protect employees who act in
 defense of third parties? See § 18-1-704(1)
("[A] person is justified in using physical force 1
 A

 upon another person in order to defend himself or a third
 person ...." (emphasis added)). Presumably so.

 ¶96
 Does it include a "no duty to retreat" doctrine
 like that recognized in our case law? See People v.
 Toler, 9 P.3d 341, 348 (Colo. 2000). Presumably so.

 ¶97
 Does it encompass the similarly "inalienable" right
 to "protect[] property" also found in article II,
 section 3 of the Colorado Constitution and codified at
 section 18-1-706? Presumably so. After all, it shares all the
 same qualities the majority relies on to justify importing
 section 18-1-704's criminal right to selfdefense, with
 both an expansive constitutional provision and a more
 detailed criminal statute supporting it.

 ¶98
 Taken together, after today, a private employer may no longer
 terminate an employee who violates a "Don't Chase or
 Confront Policy" like Circle K's. And despite the
 majority's suggestion that its opinion does not address
 the ongoing viability of such de-escalation policies,
 see Maj. op. ¶ 10 n.3, today's opinion
 effectively nullifies them. The consequence, I fear, will be
 workplaces that are less safe. Equally concerning is how the
 majority's reformulation of the Martin Marietta
 test will impact future cases.

 ¶99
 For example, after today, an employee who is fired for
 sharing sensitive business information online about their
 private employer would presumably have 1 E

 a basis for a wrongful termination suit on grounds that the
 employee was exercising an "essential, inalienable"
 right to free speech.

 ¶100
 Similarly, an employee who is fired for pulling a concealed
 weapon on a suspected shoplifter in the workplace would
 presumably have a basis for a wrongful termination suit on
 grounds that the employee was exercising their right to bear
 arms under article II, section 13 of the Colorado
 Constitution and Colorado's Concealed Carry Act,
 §§ 18-12-201 to -214, C.R.S. (2025).

 ¶101
 At a minimum, an employee who confronts and tackles a
 suspected shoplifter to prevent them from stealing (risking
 injuries to the shoplifter, the employee, and other
 customers) may not be fired for such behavior. Under the
 majority's reasoning, the employee now has a plausible
 argument that the "inalienable" right to
 "protect[] property," Colo. Const. art. II, §
 3, coupled with the right to act in defense of property under
 section 18-1-706, establishes a publicpolicy exception to the
 doctrine of at-will employment.

 ¶102
 Before today, our case law would have indicated that the
 right to defend property is a purely personal interest and
 not one that "affect[s] society at large."
Weissman, 938 P.2d at 552. It would have made clear
 that public-policy exceptions must have some direct
 connection to "right[s] or privilege[s] as a
 worker." Martin Marietta, 823 P.2d at 109. But
 after today, a right need only be "inalienable" to
 impact the public and need only be able to "occur at
 work" to be related to rights

 and privileges as a worker. Maj. op. ¶¶ 45, 54. I
 worry where this new version of the public-policy exception
 doctrine will lead us.

 III.
Conclusion

 ¶103
 Today the majority departs from our previously cautious
 approach to public-policy exceptions to at-will employment.
Along the way, it dismantles the important guardrails we
 placed on this doctrine in Martin Marietta and opens
 the door to far more public-policy exceptions, many of which
 could leave workplaces less safe. In short, the majority has
 left the doctrine in precisely the "unwieldy and
 unpredictable" place we warned against thirty years ago
 in Mariani. 916 P.2d at 524. For all these reasons,
 I respectfully dissent.

---------

[1] Circle K's description of these
 events differs significantly from Moreno's. It contends
 that Moreno was trying to stop Tyler Wimmer from stealing
 cigarettes. While we accept the facts as set out in the
 complaint and the opinions of the federal court(s) below to
 provide some background on the way to answering the certified
 question, we note that the issue presented is one of law. Our
 decision does not turn on either party's version of the
 facts. See In re Phillips, 139 P.3d 639, 642 (Colo.
2006) ("We recite these facts [from the district court]
 to give context for the certified question.");
Klabon v. Travelers Prop. Cas. Co. of Am., 2024 CO
 66, ¶ 3 n.1, 556 P.3d 793, 798 n.1 ("We derive the
 following facts from Klabon's complaint and the district
 court's certification order."). And, as we have
 already explained, we express no opinion as to whether Moreno
 acted to defend herself or the cigarettes.

[2] Later, Wimmer pleaded guilty to
 menacing with a deadly weapon.

[3] As previously noted, the only issue
 before us is the purely legal one set forth in the certified
 question. Moreno contends that Circle K's "Don't
 Chase or Confront" policy prohibits its employees from
 exercising their right to self-defense. Circle K contends it
 does not. It asserts that the company's policy aims to
 prevent employees from provoking encounters with
 shoplifters and placing themselves in situations where
 self-defense is necessary. For the reasons we have already
 explained, we express no opinion on this dispute.

[4] However, a division applying a similar
 wage order in slightly different circumstances concluded that
 the order did create "clearly expressed public
 policy." Bonidy, 186 P.3d at 85. The division
 distinguished the case from Weissman, noting that
 Bonidy had presented evidence that, as a dental assistant, a
 lack of rest and lunch breaks could adversely affect the
 safety of patients, and thus, the public. Id. So, a
 source may express a public policy "relating to
 certain employees' basic rights,"
id., so long as denying an employee those rights
 would increase the risk of their customers and, by extension,
 the public.

[5] We cabin our holding today to
 exercises of self-defense, as the Colorado
 Constitution only establishes self-defense as an
 inalienable right. See Colo. Const. art. II, §
 3.

[1] Section 18-1-704 is codified in
 article 1, part 7 of the Colorado Criminal Code, entitled
 "Justification and Exemptions from Criminal
 Responsibility."

---------